# CRIMINAL COMPLAINT

| UNITED STATES DISTRICT COURT | CENTRAL DISTRICT OF CALIFORNIA |
|---|---|

| UNITED STATES OF AMERICA | DOCKET NO. |
|---|---|
| v. | |
| GABRIEL BENHAROSH aka Gavriel Benharosh aka Gavriel Ben Harosh aka Gavriel Ben-Harosh | MAGISTRATE'S CASE NO. <br> 11- **11-0040M** <br> FILED <br> JAN - 5 2011 |

Complaint for violation of 18 U.S.C. Section 1028A(a)(1)

| NAME OF MAGISTRATE JUDGE <br><br> THE HONORABLE PATRICK J. WALSH | UNITED STATES <br> MAGISTRATE JUDGE | LOCATION <br><br> Los Angeles, CA |
|---|---|---|

| DATE OF OFFENSE <br> October 2006 through December 2006 | PLACE OF OFFENSE <br> Los Angeles County | ADDRESS OF ACCUSED (IF KNOWN) <br> 5521 Vantage Avenue, Valley Village (North Hollywood), CA 91607 |
|---|---|---|

**COMPLAINANT'S STATEMENT OF FACTS CONSTITUTING THE OFFENSE OR VIOLATION:**

Between October 2006 through December 2006, defendant GABRIEL BENHAROSH aka Gavriel Benharosh aka Gavriel Ben Harosh aka Gavriel Ben-Harosh, in Los Angeles County, within the Central District of California, knowingly transferred, possessed, and used, without lawful authority, a means of identification of another person, that is, a legal permanent resident card, during and in relation to mail fraud and misuse of evidence of naturalization, felony violations of Title 18, United States Code, Section 1341 and 18 United States Code, Section 1423.

**BASIS OF COMPLAINANT'S CHARGE AGAINST THE ACCUSED:**

(See attached affidavit which is incorporated as part of this Complaint)

MATERIAL WITNESSES IN RELATION TO THIS CHARGE:

| Being duly sworn, I declare that the foregoing is true and correct to the best of my knowledge. | SIGNATURE OF COMPLAINANT <br> RYAN WILSON /s/ |
|---|---|
| | OFFICIAL TITLE <br> SPECIAL AGENT –DHS, Homeland Security Investigations |

Sworn to before me and subscribed in my presence,

| SIGNATURE OF MAGISTRATE JUDGE(1) <br><br> PATRICK J. WALSH | DATE <br><br> January 5, 2011 |
|---|---|

1) See Federal Rules of Criminal Procedure rules 3 and 54.

[Initials Jmc]       REC: [Bond recommendation: DETAIN]

## AFFIDAVIT FOR ARREST AND SEARCH WARRANTS

I, Ryan R. Wilson, being duly sworn, hereby depose and say:

INTRODUCTION

1.    I am a Special Agent ("SA") with the United States Department of Homeland Security ("DHS"), Immigration and Customs Enforcement ("ICE"), and now referred to as "Homeland Security Investigations" ("HSI"), in Long Beach, California.  The Immigration and Naturalization Service ("INS") was an agency that was merged into DHS.  DHS, ICE, HSI and, formerly, INS are all part of the Executive Branch of the government of the United States of America ("U.S.").  I have been employed by HSI and its predecessor agencies since August 2004.  I completed the Criminal Investigator Basic Training Program, and the ICE Special Agent Training Program at the Federal Law Enforcement Training Center, Glynco, Georgia, where I received training in violations of criminal and immigration law, as well as the preparation and execution of search and arrest warrants.  During the course of my employment with ICE, I have received classroom and on-the-job training in the detection and interception of document fraud, visa fraud, the misuse of passports, visas, and other entry documents.

2.    In addition, I have received extensive classroom and on-the-job training relating to the investigation of, and

1

execution of search warrants for violations committed by illegal aliens to aid in their continued presence in the U.S. Through my training, experience and discussions with other law enforcement personnel, I have become familiar with the methods used by criminal elements to unlawfully obtain immigration benefits for illegal aliens or for persons who do not qualify for citizenship or a change in immigration status.

3.   The facts, opinions and inferences drawn from those facts set forth in this affidavit are based on my personal observations, training and experience as well as on information obtained during the course of the investigation of G. BENHAROSH, S. BENHAROSH and LEVI for their respective commission of federal offenses, discussed below.  This information includes, but is not limited to, information provided to me, either orally or through a written document, from other law enforcement or government personnel from DHS, HSI, the U.S. Drug Enforcement Administration ("DEA"), the Los Angeles Police Department ("LAPD"), the U.S. Attorney's Office for the Central District of California ("USAO-CDC"), the U.S. Social Security Administration ("SSA"), the U.S. Internal Revenue Service ("IRS") and the California Department of Motor Vehicles ("DMV").

PURPOSE OF AFFIDAVIT

4.   First, this affidavit is made in support of a criminal complaint and arrest warrant for Gavriel Benharosh aka Gavriel

2

Ben Harosh aka Gabriel Benharosh aka Gavriel Ben-Harosh ("G.

BENHAROSH"), charging him with violations of 18 U.S.C. § 1001

[False or Fraudulent Statements]; 18 U.S.C.

§ 1028A [Predicates for this offense are mail fraud (18 U.S.C. §

1341) and misuse of evidence of naturalization (18 U.S.C.

§ 1423)]; 18 U.S.C. § 1341 [mail fraud]; 18 U.S.C. § 1423

[Misuse of Evidence of Naturalization]; 18 U.S.C. § 1425

[Attempted Procurement of Naturalization of Another Unlawfully];

18 U.S.C. § 1546 [False Statement on Immigration Document]; 42

U.S.C. § 408(a)(6) [Furnishing False Information to the Social

Security Administration]; 42 U.S.C. § 408(a)(7)(A) [Fraudulent

Use of a Social Security Number Produced by False Information]

and 42 U.S.C. § 408(a)(7)(B) [Fraudulent Use of a Social

Security Number on Non-Federal Documents](collectively, "G.

BENHAROSH's OFFENSES").

    5.   Second, this affidavit is made in support of a

criminal complaint and arrest warrant for Simcha Benharosh aka

Simcha Ben Harosh aka Simcha Ben-Harosh and Simcha B. Harosh

("S. BENHAROSH") and Rafael LEVI aka Rafael Levy ("LEVI"),

charging them each with violations of 18 U.S.C. § 371

(Conspiracy to commit a federal offense, namely the offenses

listed hereinafter); 18 U.S.C. § 1001 (False or Fraudulent

Statements); 18 U.S.C. § 1546 (False Statement on Immigration

Document); 8 U.S.C. §§ 1324(a)(1)(A)(iv), (B)(I) (Encouraging or

Inducing Aliens to Reside in the U.S. Illegally); 8 U.S.C. §§ 1325(c) (Marriage Fraud) and 18 U.S.C. § 1621 (Perjury) (referred to as "S. BENHAROSH's OFFENSES or LEVI's OFFENSES"). Collectively, G. BENHAROSH, S. BENHAROSH and LEVI are referred to herein as, the "TARGET SUBJECTS."

6.   Third, this affidavit is made in support of an application for search warrants of the residence of G. BENHAROSH and S. BENHAROSH; the apartment of LEVI; the location of G. BENHAROSH's employment, namely, a Synagogue called "Gavriel Israel Achim," and an off white storage container immediately adjacent to the Synagogue; the vehicles driven by the TARGET SUBJECTS (described below); and a safety deposit box at Bank of America under the name S. BENHAROHSH and LEVI (described below), for evidence, fruits, and instrumentalities of violations of certain of G. BENHAROSH's OFFENSES, S. BENHAROSH's OFFENSES or LEVI's OFFENSES, as more specifically described below.

7.   This affidavit is intended to show that there is probable cause for the requested complaints, arrest warrants, and search warrants, and does not purport to set forth all of my knowledge of, or investigation into this matter. Therefore, not all the evidence and facts known to me about the commission of G. BENHAROSH's OFFENSES, S. BENHAROSH's and LEVI's OFFENSES are referenced herein.  All times stated herein are approximations and all dates are on or about.  Some of the information herein

was provided to me in summary form by other investigators or the USAO-CDC.

SUMMARY OF FACTS

8.    Beginning in the year 2006, in multiple applications and forms filed with federal and state governmental agencies and financial institutions, G. BENHAROSH represented, often under penalty of perjury, that he was a lawful permanent resident with DHS Alien Registration number XXX-XXX-613.  However, this Alien Registration number does not belong to G. BENHAROSH.  In fact, it was lawfully issued by DHS (previously, INS) to a man with a similar name to G. BENHAROSH who resides in New Jersey.  Through misrepresentations about his true identity and his true immigration status on a DHS USCIS Form I-90, G. BENHAROSH obtained a lawful permanent resident card (aka "green card") with number XXX-XXX-613.[1]  The green card states, "Name Ben Harosh, Gavriel," "Permanent Resident Card," "A# XXX-XXX-613, and "Resident Since 12/05/05"  Then, G. BENHAROSH used the aforementioned green card to obtain a Social Security Administration number ("SSN") XXX-XX-5506.  Then, G. BENHAROSH used the aforementioned SSN to obtain California Driver's License No. E1XXXX28 and to open accounts at financial institutions.

---

[1] Social Security numbers, DHS Alien Registration Numbers and California Driver's License Numbers and other identifying information have been redacted for security reasons.

9.    In my view, G. BENHAROSH would have a very difficult time obtaining lawful permanent resident status because of his criminal history, among other reasons.  For instance, according to an English translation of a rap sheet, in Hebrew, from the Israeli National Police, G. BENHAROSH was convicted in Israel of the following charges on or about: July 11, 1985 of two counts of manslaughter and sentenced to a term of imprisonment of approximately eighteen years in Israel (G. BENHAROSH was released from prison early); December 13, 1983 of attempted interference with a police officer during his duty (resisting arrest) and sentenced to 18 weeks in jail and an additional six months suspended sentence for three years; and on or about May 15, 1983, of major fraud and counterfeit and sentenced to forty-five days in jail and an additional six months suspended sentence for three years.  Also, on or about March 2, 2006, in U.S. v. Gabriel Benharosh, 04-373(B)-R, U.S. District Court for the Central District of California, related to the Hai Waknine case discussed below, G. BENHAROSH pled guilty to a single count information charging a violation of 18 U.S.C. Section 1956(a)(2)(B) (transportation of monetary currency from an unlawful activity) and, later, sentenced to a "suspended" sentence, probation for a term of five years (terminated early) and a $40,000 fine.

6

10. The evidence against S. BENHAROSH and LEVI indicates that in the year 2006 G. BENHAROSH's attempted to gain immigration status for S. BENHAROSH.  On or about July 12, 2007, S. BENHAROSH and G. BENHAROSH obtained a religious divorce.  On or about November 14, 2008, S. BENHAROSH and LEVI married.  In the years 2008, 2009 and 2010, LEVI sought to adjust S. BENHAOSH's immigration status through filings and interviews with USCIS, some under penalty of perjury.  In these filings to and during the interviews with USCIS, S. BENHAROSH and LEVI, repeatedly, made representations that S. BENHAROSH and LEVI resided together throughout their marriage, among other representations that attempted to demonstrate that they lived together as husband and wife.  However, extensive surveillance by law enforcement and documents, among other evidence, revealed that S. BENHAROSH and LEVI did not in the past and do not currently reside together, but, in fact, have lived and do live, separately.  In fact, the evidence showed that S. BENHAROSH and G. BENHAROSH continued to live together after S. BENHAROSH entered into the sham marriage with LEVI.

<u>PREMISES TO BE SEARCHED</u>

11.  The premises to be searched are the following locations:

(a) **SUBJECT PREMISES #1,** located at 5521 Vantage Avenue, North Hollywood (Valley Village), California ("CA") 91607, is

the residence of G. BENHAROSH, S. BENHAROSH and four of their
children and is described more fully in Attachment A hereto,
including any attached and/or unattached garages, out-buildings,
sheds, storage places, or vehicles on the property. **SUBJECT
PREMISES #1** is a single-story residence with a driveway that
runs along the south side of the residence, through a gate,
leading to a two-car detached garage to the rear of the
residence.

(b) **SUBJECT PREMISES #2,** located at 5252 Corteen Place,
#37, North Hollywood (Valley Village), CA 91607, is described
more completely in Attachment A hereto and is an apartment
within an apartment building.

(c) **SUBJECT PREMISES #3,** located at 12426 Burbank
Boulevard, North Hollywood (Valley Village), California, 91607;
is described in Attachment A; and is the Gavriel Israel Achim
Synagogue aka Israel Achim Synagogue and is two combined units
in a single story strip mall style building complex that
contains multiple individual commercial units. The Gavriel
Israel Achim Synagogue occupies the last two units of the strip
mall on the far west end. A rough sketch, not to scale, of the
interior of the **SUBJECT PREMISES #3,** attached at Attachment C
hereto, was drafted by a DEA SA who entered the location in
September 2010. In order to be respectful, we plan to execute
the search warrant of **SUBJECT PREMISES #3** at a time when formal

8

services are not being conducted, based on our surveillance. Excluded from the search of **SUBJECT PREMISES #3** will be, (1) the main ceremonial area, that is described in Attachment C hereto as "Main Area"; (2) the kitchen area, that is described in Attachment C hereto as "Kitchen"; and (3) any restrooms.

(d) **SUBJECT PREMISES #4**, located in an alley immediately adjacent to **SUBJECT PREMISES #3**, is an off-white commercial container that G. BENHAROSH recently admitted to a DEA SA belonged to G. BENHAROSH and is described in Attachment A which is incorporated by reference into this affidavit.

THE VEHICLES TO BE SEARCHED

12.    The vehicles to be searched are described in Attachment A and are the following:

(a) **SUBJECT VEHICLE #1** is a 2007 Mercedes, grey in color, four doors, with vehicle identification number ("VIN") WDDNG71X87A140538 and, as of December 2010, is registered at the DMV to "Gavriel Benarosh" at **SUBJECT PREMISES #3**. **SUBJECT VEHICLE #1** was seen driven by G. BENHAROSH and was seen parked at **SUBJECT PREMISES #1**, recently, on December 23, 2010;

(b) **SUBJECT VEHICLE #2** is a 2010 Jeep Laredo, black color four, (4) door sport utility vehicle, bearing California license plate number 6MCZ728, VIN IJ4PR4GKOAC100239, registered at the DMV to Albert Tamsout or Gavriel Benharosh with an address of **SUBJECT PREMISES #3**. **SUBJECT VEHICLE #2** was seen driven by S.

BENHAROSH and was seen parked at **SUBJECT PREMISES #1,** throughout December 2010 and, recently, on December 23, 2010.

(c) **SUBJECT VEHICLE #3** is a 2009 Ford Mustang, red color, bearing California license plate number 6FOJ034 and registered with DMV to Alon Group Inc.  In the year 2010, Bank of America account statements in the name "Alon Group, Inc" were sent to **SUBJECT PREMISES #3.**

(d) **SUBJECT VEHICLE #4** is a Toyota Avalon, gold color, bearing California license plate number 5ZRL692, and seen driven by LEVI, and seen parked at or in front of the apartment complex located at **SUBJECT PREMISES #2** as recently as December 23, 2010.

SAFETY DEPOSIT BOX

13.  The safety deposit box in the name of Simcha Ben-Harosh or Rafael Levi at Bank of America, for all accounts, including account 04186-01453, located at the Bank of America Sherman Oaks Branch, 14701 Ventura Blvd, Sherman Oaks CA 91403.

ITEMS TO BE SEIZED

14.  The detailed descriptions of the items to be seized from each location are described below and in Attachment B.

G. BENHAROSH UNLAWFULLY OBTAINED A PERMANENT RESIDENCE CARD THROUGH INDENTIFCATION THEFT

GAVRIEL BEN HAROSH IN NEW JERSEY

15.  Based on my training and experience, a DHS/USCIS "A-File" is a file in which paper copies of immigration records and

photographs and fingerprint cards are maintained for aliens admitted to or found in the U.S ("A-File"). I know that DHS creates an A-File based on the filing of immigration applications requesting that DHS confer legal permanent resident status to an alien.

16. Based on the records in the A-File for number XXX-XXX-613, "Gavriel Ben Harosh," who has a date of birth of August 20, 1958 and has residency in the state of New Jersey, lawfully obtained lawful permanent residence status under DHS A-file number XXX-XXX-613 (hereinafter, "New Jersey Ben Harosh").[2] The A-File for New Jersey Ben Harosh contained the following documents and information:

a. Notice of Action (Form I-797) indicating that Brinks Global Service, located in New York, New York, filed a Petition for a Nonimmigrant Worker (Form I-129) for New Jersey Ben Harosh on July 27, 2001.

b. On September 4, 2001, the INS (the predecessor agency to DHS) approved the Form I-129 petition, classifying New Jersey Ben Harosh as a L1A nonimmigrant (intra company transferee).

c. On July 21, 2003, New Jersey Ben Harosh entered the United States at New York City, New York, as a L1A nonimmigrant and has continued to reside in the state of New Jersey.

---

[2] In approximately May 2010, I reviewed DHS A-file number XXX-XXX-613, which is maintained for New Jersey Ben Harosh.

d.   On December 5, 2005, INS granted New Jersey Ben Harosh lawful permanent residence ("LPR") status in the United States and thereafter, New Jersey Ben Harosh received his green card that contained his photograph, fingerprint and XXX-XXX-613.

e.   Photographs of New Jersey Ben Harosh are in the original copy of the A-File for XXX-XXX-613.   In the year 2010, I observed G. BENHAROSH on surveillance in North Hollywood, California and in a picture on a California Driver's license No. E1XXXX28.   The photos in the original copy of the A-File of New Jersey Ben Harosh for XXX-XXX-613 are not G. BENHAROSH.

GABRIEL BENHAROSH HAS NO LEGAL STATUS IN THE U.S.

17.   According to reports from INS, on August 1, 2002, G. BENHAROSH arrived at Terminal Five at the Los Angeles International Airport ("LAX") with his wife (named "Oren" in the INS reports)[3] and their four children via Aero Mexico, flight number 462, from Acapulco, Mexico.   The INS primary inspector determined that G. BENHAROSH was not admissible into the United States and referred G. BENHAROSH to an INS secondary inspector for disposition.   G. BENHAROSH presented an Israeli passport, issued on January 1, 2002, bearing the name "Gabriel Ben Harosh," date of birth of November 10, 1959 and a birthplace of

---

[3] In the INS reports, G. BENHAROH's wife is identified as "Oren." However, this is a mistake, as Oren Benharosh is name of the son of G. BENHAORSH and S. BENHAROSH that was born in and around 1998.

Morocco.[4]  At the secondary inspection, INS Inspector Paul Romero

allowed G. BENHAROSH to stay in the INS secondary area

unescorted.  During this time, G. BENHAROSH took advantage of

this opportunity and absconded from INS.

    18.  G. BENHAROSH's wife and four children were admitted

into the United States as a nonimmigrant visitors (referred to

as "B2"), and they departed the United States on or about August

5, 2002.

    19.  In March 2004, a search warrant was executed at a

business location in Los Angeles, California that was owned or

operated by Hai Waknine.  In 2004, Hai Waknine and his co-

conspirator, G. BENHAROSH, were indicted, through the U.S.

Attorney's Office for the Central District California ("USAO-

CDC"), in a federal RICO, extortion and money laundering case

entitled, U.S. v. Hai Waknine, Gabriel Benharosh, et al., United

States District Court for the Central District of California,

Case No. CR 04-373(A).[5]  During the search in March 2004, agents

_____

[4] Also, on August 1, 2002, at LAX, G. BENHAROSH presented a
driver's license from the Ministry of Transport for the State of
Israel, No. Israeli DL XXXXXX863, bearing a photograph of G.
BENHAROSH.

[5] The following information was provided by the USAO-CDC and based, in part, on
court records:

    On or about March 26, 2004, in Canada, G. BENHAROSH was arrested on a
provisional arrest warrant requested by U.S Attorney's Office for the Central
District of California ("USAO-CDC") via U.S. DOJ's Office of International
Affairs, based on a complaint filed in the USDC-CDC that charged G. BENHAROSH
with violations of 18 USC 894 (collections of extensions of credit by
extortionate means) and 18 USC 1957 (engaging in monetary transactions in

discovered three internal INS memoranda of investigation dated
August 27, 2002 relating to G. BENHAROSH's escape from an INS
inspection at LAX on August 1, 2002, and a print-out of a
notification from the Consular Lookout and Support System
notifying certain government entities that G. BENHAROSH "would
be ineligible for a [v]isa." Based on my experience and
discussions with other investigators, these INS documents are
not publicly available and are not for public dissemination.
DHS conducted an investigation into how these INS documents
ended up at a business of Hai Waknine in Los Angeles.

    20. The following information in this paragraph is from a
source of information ("SOI")[6] who was in a position to know

---

property derived from specified unlawful activity). In and around October
2004, G. BENHAROSH was extradited to the USDC-CDC by the Canadian Royal
Mounted Police based on the provisional arrest warrant. Later, a first
superseding indictment was filed that was entitled, U.S. v. Hai Waknine, G.
BENHAROSH, et al., Case CR No. CR 04-373(A)-R.

    On or about October 22, 2004, G. BENHAROSH made his initial appearance
in USDC-CDC on Case No. CR 04-373. G. BENHAROSH was temporarily detained.
On or about November 29, 2004, G. BENHAROSH was released on a $1 million cash
bond with affidavit with justification of surety; $350,000 real property,
secured by deed of trust, $650,000 collateral, via irrevocable line of credit
and additional $1,000,000 cash or surety bond to be posted within 45 days of
release; 24 hour house arrest; and electronic monitoring. Based on the
Court's docket, the funds were the property of "Amir Elad" (G. BENHROSH's
construction company in Israel). Later, the conditions of release were
modified by the Court.

    Between, approximately, November 2004 and July 2006, G. BENHAROSH was
under the supervision of USDC-CDC Pre-Trial Services.

[6]    Currently, the SOI is incarcerated and is not cooperating with law
enforcement. At the time of the SOI's above-referenced interview, the SOI
was incarcerated and was trying to reduce a very lengthy term of imprisonment
for conviction of a serious crime. According to the USAO-CDC, in a prior
interview of the SOI, the SOI appeared to have minimized SOI's own role in
certain crimes and minimized the role of other co-conspirators in certain
crimes, and, in fact, refused to provide details about certain crimes. The

these events: G. BENHAROSH asked Hai Waknine to do whatever it

took to obtain the original INS records related to G.

BENHAROSH's attempted entry into the United States [at LAX] in

August 2002.  G. BENHAROSH wanted all INS records related to him

to disappear so that G. BENHAROSH could attempt to re-enter the

United States.  In response, Hai Waknine contacted an attorney

who specializes in immigration issues ("Attorney #1") and asked

Attorney #1 to aid in the retrieval of G. BENHAROSH's INS

records in exchange for payment to Attorney #1.

    21.  There is some corroboration for the information

provided by the SOI.  During a federal court authorized wiretap

in and around October 2003, conversations between Hai Waknine

and Attorney #1, an immigration lawyer, are intercepted during

which (1) Attorney #1 indicates that Attorney #1 cannot discuss

certain things with Hai Waknine on the phone and they would have

to discuss the things face to face and (2) in, apparently, vague

and coded language, Hai Waknine indicated to Attorney #1 that

Hai Waknine would have someone bring money to Attorney #1.[7]

Also, in vague and coded language, in other intercepted calls in

and around September and October 2003, Hai Waknine and

---

SOI has engaged in multiple acts of fraud and deceit, as well as other
unlawful conduct, for over ten years.  The SOI has several criminal
convictions.  If the SOI's prior cooperation was revealed to the public, the
SOI's personal safety would be placed in serious jeopardy.

[7] The above descriptions of intercepted telephone calls are general
descriptions of summaries of wiretap conversations (some of which are
summaries of English translations of conversations in Hebrew) and are not
verbatim recitals of those conversations.

G. BENHAROSH discussed Attorney #1 in regards to attempting to obtain items, such as a suitcase.

22.    On March 2, 2006, G. BENHAROSH pled guilty to one count of violation 18 U.S.C. Section 1956(a)(2)(B), namely, transporting money known to be derived from a specified unlawful activity, in Case No. CR 04-373(A).    In and around 2007, with his counsel present, G. BENHAROSH was interviewed by law enforcement about, among other things, G. BENHAROSH's absconding from INS at LAX on August 1, 2002 and about G. BENHAROSH's interaction with  Attorney #1.  During the interview, G. BENHAROSH claimed that an INS Officer allowed him to leave the INS inspection area and that G. BENHAROSH did not discuss dollar amounts with Hai Waknine or Attorney #1 regarding getting his passport or a suitcase back.

23.    On March 23, 2006 and April 17, 2006, with his counsel present, G. BENHAROSH was interviewed by U.S. Probation Officer ("USPO") Michael Barrett.  According to the USPO Barrett's pre-trial sentence report issued on or about May 22, 2006, G. BENHAROSH possessed a DHS Alien Registration number XXX-XXX-613, no social security number, a date of birth of December 22, 1959[8], a wife named Semcha Benharosh who he married in 1987, and five

---

[8] An Israeli Certificate of Marriage and various filings with USCIS state that S. BENHAROSH and G. BENHAROSH were married in Israel on May 23, 2000.  The Israeli Marriage Certificate and G. BENHAROSH's Israeli passport (bearing the name and likeness of "Gabriel Ben Harosh") state that his date of birth is November 10, 1959.

children.[9]  Per USPO Barrett's report, ICE indicated to the USPO
that G. BENHAROSH is legally residing in the United States as a
permanent legal residence.[10]  ICE's response to the USPO about G.
BENHAROSH's immigration status was likely based on ICE
personnel's review of ICE's information for Alien Registration
number XXX-XXX-613 that belonged to New Jersey Ben Harosh (who
was a law permanent resident).

    24.  On or about March 26, 2010, I conducted database
checks of ICE records and records maintained by ICE and USCIS in
order to determine whether G. BENHAROSH was lawfully residing in
the United States.  These databases contain information
routinely used by HSI agents to determine the immigration status
of individuals.  From my review of the ICE and USCIS databases,
I learned that there are no records indicating that G. BENHAROSH
was ever issued a lawful permanent resident card or that he has
any valid immigration status in the United States.

    <u>IN AND AROUND OCTOBER 2006, G. BENHAROSH OBTAINED A GREEN
    CARD BY FRAUD</u>

    25.  Also, from ICE/USCIS databases and my investigation, I
learned that on September 14, 2006, G. BENHAROSH filed an
Application to Replace Permanent Resident Card (Form I-90) for

---

[9] I have not read any portion of the aforementioned PSR.  I was provided the
information in the PSR from AUSA J. Mark Childs.
[10] After testifying against a co-defendant Hai Waknine in June 2006,
G. BENHAROSH was sentenced to time served and a term of "probation" that
terminated early by the Honorable Manuel Real in and around December 2008 or
December 2009.

DHS Alien Registration number XXX-XXX-613.  The form was submitted through the USCIS Lockbox, located at 16420 Valley View Avenue, La Mirada, CA  90638, sent by mail to and processed at the USCIS National Benefits Center, Lee's Summit, Missouri.

26.  On July 6, 2010, I received a copy of an Application to Replace Permanent Resident Card (Form I-90), No. MSC-06-404-78490, dated September 13, 2006 and signed by G. BENHAROSH.[11]  It indicated the following:

a.  G. BENHAROSH lived at 12613 Emelita Street, North Hollywood, CA 91607 and had a birth date of August 20, 1958.[12]

b.  G. BENHARSOH is a Lawful Permanent Resident of the United States.

c.  G. BENHAROSH's lawful permanent resident card was lost, stolen, or destroyed.

d.  G. BENHAROSH's immigration status was automatically converted to permanent resident.

27.  In the signature box of the Form I-90, G. BENHAROSH signed the application under penalty of perjury attesting that all evidence submitted was true and correct.  A United States Postal money order in the amount of $260.00 was submitted with

---

[11] I have become familiar with the signature of G. BENHAROSH based on (1) the signature is distinctive, it is often the initials "GBH" within a loop;
[12] An Israeli Certificate of Marriage between G. Benharosh and S. Benharosh (submitted to DHS on behalf of LEVI and S. BENHAROSH) as well as G. BENHAROSH's Israeli passport (bearing the name and likeness of "Gabriel Ben Harosh") stated that his date of birth is November 10, 1959.

the Form I-90.  USCIS records show a receipt notice was mailed

to G. BENHAROSH, indicating that USCIS received the application.

28.  On October 11, 2006, G. BENHAROSH's form I-90 was

approved.  On October 20, 2006, the National Benefit Center

produced a green card for G. BENHAROSH.  This green card was

mailed from outside of California to 12613 Emelita Street, North

Hollywood, CA 91607 (Emelita Street Residence").  The following

is evidence that G. BENAHAROSH resided at the Emelita Street

Residence in October 2006: (a) bank records from East-West Bank

for Amir Elad[13] and G. Benharosh  (that identified G. BENHAROSH

with a date of birth of November 10, 1959 and an Israeli

Driver's license no. of 026786863 and that identified S.

BENHAROSH with a date of birth of June 29, 1957 and a CADL

number of D7718760) stated the Emelita Street Residence as the

address for the account holders for between January 2006 to

October 2006; (b) a USCIS Form G-325A, Biographic Information,

dated December 19, 2006, signed by G. BENHAROSH and attached a

photograph of G. BENHAROSH, stated that G. BENHAROSH's residence

between September 2005 and October 2006 was the Emelita Street

Residence; and (c) on May 3, 2006, USPO Michael Barrett visited

G. BENHAROSH at the Emelita Street Residence.

---

[13]   The Form G-325A, discussed below, dated December 19, 2006
and signed by G. BENHAROSH, stated that G. BENHAROSH was the
owner of (1) "Amir Elad, Ltd. - Jerusalem" from December 2001 to
the "Present Time" and (2) "Amir Elad USA, Inc. - Valley
Village, CA." from 2005 to the "Present Time."

## COMPARISON OF PHOTOGRAPHS

29. Within the USCIS (electronic) database for Alien Registration Number XXX-XXX-613, there are photographic images of two different people, namely, (1) G. BENHAROSH who submitted a photograph(s) with the Form I-90 dated September 13, 2006 and (2) New Jersey Ben Harosh who submitted photographs with his various filings with INS, USCIS and DHS.

30. The photograph of New Jersey Ben Harosh in the USCIS (electronic) database is identical to the photographs contained in the original (paper) A-File for XXX-XXX-613. Accordingly, I determined that A-File XXX-XXX-613 and the LPR status for XXX-XXX-613 by DHS or INS apply to or belong to New Jersey Ben Harosh and not G. BENHAROSH.

31. Based on the foregoing, G. BENHAROSH had no basis to apply for a replacement Permanent Resident card on the Form I-90, for among other reasons, because (1) in August 2002, G. BENHAROSH was determined by the INS to be inadmissible for entry into the United States, (2) the records contained in the A-file (XXX-XXX-613) relate to New Jersey Ben Harosh and do not relate or apply to G. BENHAROSH, and (3) there is no evidence that G. BENHAROSH was ever a lawful permanent resident.

## APPLICATION FOR SOCIAL SECURITY CARD

32. According to a Special Agent with the Social Security Administration ("SSA"), SSA database records for SSA Number XXX-

XX-X506, and official certified records from SSA for that SSA

number, on or about October 23, 2006, at a SSA Office in Van

Nuys, California, an application for an original Social Security

Card was submitted with name "Gavriel Ben Harosh." The

application contained a date of birth of August 20, 1958 (the

same birth date as New Jersey Ben Harosh and the same birth date

as on California Driver's License No. E1XXXX28 for "Gavriel

Benharosh" that contained a photograph of G. BENHAROSH) and an

address of 12613 Emelita Street, Valley Village, CA 91607 (this

address is crossed out on the application and amended to reflect

an address of 12618 Califa St., Valley Village, CA 91607

("Califa Street Residence")).  The Califa Street Residence is

the same address that is on G. BENHAROSH's California Driver's

License No. E1XXXX28.[14]

     33.  Based on the SSA records and information from a SSA

SA, the above-described SSA records reveal that on or about

November 15, 2006, an interview of an applicant named "Gavriel

Ben Harosh" was conducted by SSA personnel in a SSA Office in

Van Nuys, California in order to determine the eligibility of

"Gavriel Ben Harosh" to receive a new SSA number and SSA card.

In order for an applicant to obtain a new SSA number and SSA

---

[14] A Form G-325A, discussed above, signed by G. BENHAROSH and
dated December 19, 2006, stated that G. BENHAROSH's residence
between October 2006 and the "Present Time" (namely, December
19, 2006) was the Califa Street Residence.

card, an applicant needs to provide the SSA interviewer, among other things, with (1) evidence of citizenship or alien status (such as proof of Legal Permanent Residence Status, e.g., a green card); (2) age; and (3) identity.

34. According to the SSA records, during the interview with the SSA personnel, "Gavriel Ben Harosh" satisfied the SSA requirement for proof of lawful alien status by submitting to SSA a DHS/ICE green card, "XXX-XXX-613," with a residence date of December 5, 2005 and an expiration date of October 12, 2016. However, as discussed above, Alien Registration number XXX-XXX-613 belongs to New Jersey Ben Harosh. The green card that was fraudulently obtained (through the submission of the Form I-90) by G. BENHAROSH states, among other things, the following: Alien Registration Number XXX-XXX-613, a residence date of December 5, 2005, and an expiration date of October 12, 2016.

35. Directly above the signature line on the SSA application, the SSA application indicates that deliberately furnishing (or causing to be furnished) false information on the SSA application is a crime punishable by fine, imprisonment or both. Directly below this admonishment is the signature "GBH" and the date November 15, 2006. The signature that reads "GBH" on the SSA application is remarkably similar to the signature that reads "GBH" on CADL No. E1XXXX28 with a photograph of G. BENHAROSH.

36.  Based on SSA records and statements from a SSA SA, the aforementioned SSA application of "Gavriel Ben Harosh" was approved and, subsequently, a Social Security Card with number XXX-XX-X506, was mailed from Baltimore, Maryland to 12618 Califa St., Valley Village, CA 91607.

37.  Based on the foregoing, it is clear that G. BENAHROSH used the green card with XXX-XXX-613 (that belonged to New Jersey Ben Harosh) to obtain a Social Security Card with number XXX-XX-X506 and, as discussed below, G. BENHAROSH used this social security number to obtain California Driver's License No. E1XXXX28.

G. BENHAROSH USED THE GREEN CARD THAT WAS OBTAINED BY FRAUD TO APPLY FOR IMMIGRATION STATUS FOR S. BENHAROSH AND THEIR CHILDREN

38.  On or about December 21, 2006, six Form I-130s, Petition for Alien Relative, were filed in support of establishing a family relationship between G. BENHAROSH and S. BENHAROSH and their five children (A.D. Ben Harosh, E. Ben Harosh, A. Ben Harosh, O.E. Ben Harosh, and I.Y. Ben Harosh). On each of the six Form I-130s, G. BENHAROSH claimed that he was a lawful permanent resident, his Alien Registration number was XXX-XXX-613, his Social Security Number was XXX-XX-5506 and his birth date was December 22, 1959.  In the Form G-325A, Biographic Information, signed by G. BENHAROSH and dated December 12, 2006 (and attached a photograph of G. BENHAROSH),

G. BENHAROSH claimed his name was "Gavriel Ben Harosh," his birth date was December 22, 1959, his Alien Registration number was XXX-XXX-613, and his Social Security Number was XXX-XX-5506.

39. However, based on my review of the DHS files for XXX-XXX-613, information from SSA, and my investigation, (1) Alien Registration number XXX-XXX-613 does not belong to G. BENHAROSH (in fact, it was issued by DHS or INS to New Jersey Ben Harosh), (2) G. BENHAROSH obtained a lawful permanent resident card with number XXX-XXX-613 through false statements on a Form I-90, and (3) G. BENHAROSH obtained SSA number XXX-XX-5506 through the use a lawful permanent resident card with number XXX-XXX-613 that G. BENHAROSH obtained by fraud.

40. On or about August 20, 2009, the DHS USCIS Western Service Center in Laguna Niguel, California approved the six I-130 petitions (pursuant to section 203(a)(2) of the Immigration and Nationality Act) and forwarded Notices of Approval to G. BENHAROSH at 12618 Califa Street, Valley Village, CA.

41. As a result of the filing of six Form I-130s on or about December 21, 2006, S. BENHAROSH and each of her five children were issued Alien Registration numbers. In March 22, 2010, USCIS sent a letter to G. BENHAROSH notifying him that visas issued pursuant to the Form I-130s for S. BENHAROSH and their children had been retroactively terminated based on the termination of their marriage.

RECORDS OBTAINED FROM THE DMV

42.  According to certified records from the California Department of Motor Vehicles ("DMV"), on November 16, 2006, the approximate day after G. BENHROSH's interview with SSA, G. BENHAROSH applied for a CADL and had his picture taken at a DMV office number 515 that, according to DMV's website, is located at 14920 Vanowen Street, Van Nuys, California 91405.

43.  According to DMV records, in November 2006, "Gavriel Benharosh" submitted an application to DMV for a California Driver's License ("CADL") that indicated his address was 12618 Califa St., Valley Village, CA 91607 and his birth date was August 20, 1958 (the same address and birth date that is on the SSA application for "Gavriel Ben Harosh").  The birth date of August 20, 1958 is the birth date of New Jersey Ben Harosh. Subsequently, DMV issued a CADL with number E1XXXX28 for "Gavriel Benharosh" that contained a photograph of G. BENHAROSH.

44.  According to DMV personnel, DMV's computer records indicate that G. BENHAROSH used Social Security Number XXX-XX-X506 to apply for the aforementioned CADL.  However, according to DMV personnel, DMV personnel have been unable to locate G. BENHAROSH's CADL application which may, based on G. BENHAROSH's prior history, indicate foul play.

**REVIEW OF THE DHS A-FILES FOR SIMCHA BENHAROSH**

45.  I reviewed the DHS "A-file" for S. BENHAROSH, namely, A-File XXX-XXX-218.  Based on my training and experience, I know that DHS creates an A-File based on the filing of immigration applications and petitions filed by a U.S. citizen, referred to as the "petitioner," requesting that DHS confer legal permanent resident status to the alien beneficiaries based on a marriage.

46.  Based on my review of the documents in A-file XXX-XXX-218 relating to S. BENHAROSH, and also my review of DHS indices, I know the following information that LEVI and S. BENHAROSH have represented as true to DHS and USCIS, through their filings:

a.   On February 10, 1995, LEVI obtained a divorce from the Rabbinical Court of Beverly Hills, California from his ex-spouse, Israela Levy.

b.   On August 1, 2002, S. BENHAROSH was admitted to the U.S. at Los Angeles, California as a nonimmigrant visitor.

c.   On February 2, 2005, S. BENHAROSH was admitted to the U.S. at Los Angeles as a nonimmigrant visitor with an expiration of August 1, 2005,[15] along with her three (3) minor children, "E." Ben Harosh, "O.E." Ben Harosh, and "I.Y." Ben Harosh.

---

[15]   A non-immigrant visitor (also, referred to as a "B" or "B-1" or "B-2" visitor) is conferred limited status by DHS to remain or travel in the U.S. for a specified amount of time, normally under one year.  Based on review, in 2002 and 2005, S. BENHAROSH was not conveyed immigration status to stay in the U.S. for over one year.

d.   On July 12, 2007, S. BENHAROSH obtained a divorce from G. BENHARAOSH from the West Coast Rabbinical Court of Beverly Hills, California.

e.   On November 14, 2008, in Van Nuys, California, S. BENHAROSH entered into a marriage to LEVI, according to a license/certificate of marriage, signed under penalty of perjury by S. BENHAROSH and LEVI that was recorded with the County of Los Angele.  The marriage certificate stated that their address was 5331 Cortin Place, Apt# 304, North Hollywood, CA 91607.

f.   LEVI acquired citizenship of the U.S. through naturalization.

47.   Additionally, based on review of S. BENHAROSH's A-File, I know the following:

a.   On or about December 12, 2008, the DHS Service Center in the state of Missouri received by mail six Form I-130s, "Petition for Alien Relative" and six Form I-485s, "Applications to Register Permanent Residence" or Adjust Status signed by LEVI as the "Petitioner" on behalf of his spouse S. BENHAROSH and her five (5) children, the "Beneficiaries."  In each of the forms I-130, dated November 24, 2008 and signed under penalty of perjury by LEVI, LEVI claimed that he and S. BENHAROSH lived together at 5914 Wilkinson Avenue, North Hollywood, CA ("Wilkinson Avenue Residence") from September 2008 until the "PRESENT" (namely,

November 24, 2008)[16] and married on November 14, 2008 in Van

Nuys, California.  Each of the Forms I-130 were also signed by

attorney John R. Perry below an admonishment that stated that

Mr. Perry "prepared this document at the request of [LEVI] and

that it is based on all information of which I have any

knowledge."  The above Form I-130s and Form I-485s, essentially,

sought to obtain legal permanent residence status for S.

BENHAROSH and her five children through her marriage to LEVI.[17]

    b.   On November 20, 2009, the USCIS at Los Angeles, CA

forwarded an Appointment Notice, Form G-56, requesting LEVI and

S. BENHAROSH to appear before an USCIS Adjudication Officer in a

field office located at Los Angeles, California for an interview

regarding the aforementioned Adjustment of Status Applications.

    c.   On December 16, 2009, S. BENHAROSH and LEVI appeared

before an USCIS Adjudication Officer at the Los Angeles Field

Office.  The USCIS Adjudication Officer obtained sworn

statements from S. BENHAROSH and LEVI concerning the legitimacy

of their marriage.  Based on my reading of the notes of the

Adjudication Officer and my discussions with her, the

---

[16] A Form G-325A, Biographic Information, that was submitted to
USCIS, was signed by S. BENHAROSH and was dated November 24,
2008, stated that S. BENHAROSH's residence between August 2007
and the "PRESENT" (namely, November 24, 2008) was the Wilkinson
Avenue Residence.
[17] The five children are "A.D." Ben Harosh (DOB: 1991); "E." Ben
Harosh (DOB: 1993); A.B.Y. Ben Harosh (DOB: 1997); "O.E." Ben
Harosh (DOB: 1998); and "I.Y." Ben Harosh (DOB: 2004).

Adjudication Officer appeared to conclude that certain answers provided by S. BENHAROSH and LEVI concerning their marriage and information about each other were not consistent.  Also, the Adjudication Officer determined that S. BENAHROSH's rabbinical divorce from G. BENHAROSH and LEVI's rabbinical divorce from Israela Levy were not a legal divorce recognized by USCIS for immigration purposes.[18]

d.   On March 23, 2010, USCIS forwarded LEVI a Notice of Intent to Deny the Adjustment of Status Applications to 6140 Rhodes Avenue, North Hollywood, California 91606 ("Rhodes Avenue Residence"), pursuant to Title 8, Code of Federal Regulations, Section 204.2(c)(2), because those applications did not provide the requisite documentation for the purported marriage of S. BENHAROSH and LEVI and sufficient proof of their, respective, legal termination of previous marriages.

e.   On April 20, 2010, USCIS received a written notice of withdrawal from LEVI, requesting USCIS withdraw the Adjustment of Status Applications for S. BENHAROSH and her five children submitted in and around December 2008.

_____

[18] According to certified SSA records, on or about February 23, 2009, S. BENHAROSH submitted an application to obtain an original SSA number and card and was interviewed on March 4, 2009 by a SSA employees at the SSA Office in Van Nuys, California.  On the SSA application, she provided SSA with an address of "5914 Wilkinson Ave, Noth (sic) Hollywood, CA 91607." As proof of her alien status, S. BENHAROSH provided DHS Alien Registration number XXX-XXX-218.

f.   On April 23, 2010, USCIS sent LEVI a Denial Notice to the Rhodes Avenue Residence that stated that the Adjustment of Status Applications were denied as result of the withdrawal notice filed by LEVI on April 20, 2010.

THE SUBMISSION OF ANOTHER FORM I—130

48.  On or about August 12, 2010, USCIS processed a petition for an Alien Relative, Form I-130, dated July 26, 2010, that sought to adjust S. BENHAROSH's status to that of a lawful permanent resident through her purported marriage to LEVI.  The Form I-130 was signed under penalty of perjury under the laws of the U.S. with a signature that resembles the signature of LEVI based on my comparison of other documents submitted to USCIS, including LEVI's passport, and other documents that were purportedly signed by LEVI.

49.  In the Form I-130, dated July 26, 2010, it is stated that (a) LEVI and S. BENHAROSH were husband and wife; (b) their address [on or about July 26, 2010] was the Rhodes Avenue Residence; (c) they were married on November 14, 2008; and (d) that S. BENHAROSH divorced "GAVRIEL BENHAROSH" on July 12, 2007. On a Form G-325A, Biographic Information, submitted to USCIS, dated July 26, 2010, signed by LEVI, LEVI represented that he lived at the Rhodes Avenue Residence from June 2009 to the "present" (namely, July 26, 2010).  In a Form I-864, Affidavit of Support Under Section 213A of the Act, signed under penalty

of perjury by LEVI, submitted to USCIS, dated July 26, 2010,
LEVI represented that on July 26, 2010 his "[p]lace of
[r]esidence" was the Rhodes Avenue Residence.

50. On or about July 20, 2010 and July 21, 2010,
surveillance officers from ICE observed G. BENHAROSH at 6140
Rhodes Avenue North Hollywood, CA 91607. Based on the
observations of the surveillance officers, which have been
relayed to me, it appears that the only residents of the 6140
Rhodes Avenue residence are G. BENHAROSH, S. BENHAROSH, and
their children.

<u>POLE CAMERA AIMED AT THE RHODES AVENUE RESIDENCE</u>

51. Between, approximately, July 8, 2010 through August
19, 2010, a pole camera that captured video images on a 24 hour
basis (unless not functioning) was aimed in the direction of the
front of the Rhodes Avenue Residence. The pole camera ceased
operation on or about August 19, 2010.[19] The pole camera itself
was placed on public property *near but not on* the Rhodes Avenue
Residence.

52. During prior surveillance, law enforcement observed S.
BENHAROSH driving the **SUBJECT VEHICLE #2** (a black Jeep Laredo
with CA License Plate 6MCZ728) and S. BENHAROSH's purported ex-

---

[19] The pole camera, occasionally experienced technical problems, which required
adjustments or fixing. Also, during part of the time the pole camera was
operational, the view was obscured by foliage. The images captured by the
pole camera, were viewed, on occasion, contemporaneously, via a computer by
DEA SA Reuter and recorded into electronic storage.

husband, G. BENHAROSH, driving a Cadillac sports utility vehicle, white in color, California License 6DXZ178 ("Cadillac SUV").  I am able to identify G. BENHAROSH, S. BENHAROSH and LEVI, for among other reasons, because I have personally seen each of them on surveillance and/or seen each of their photographs on their respective California Driver's license, and seen the video recordings of the November 22, 2010 interview by the USCIS of S. BENHAROSH and LEVI, discussed below.

53.  I reviewed DEA SA Deanne Reuter's notes that documented SA Reuter's review of a portion of the video recording of the images captured by the pole camera in July 2010 of the Rhodes Avenue Residence.  The notes of SA Reuter's review of pole camera images cover certain dates between July 8, 2010 and July 29, 2010 and, also, reference a review of images from August 19, 2010.  SA Reuter's notes indicated the following (this is not verbatim recitals of SA Reuter's notes):

a.  For approximately twenty-two days in July 2010, in notes, SA Reuter documented her observations from the pole camera (either live or recorded), she did not positively observe LEVI or a vehicle regularly associated with LEVI at the Rhodes Avenue Residence.  SA Reuter's notes record S. BENHAROSH at the Rhodes Avenue Residence on or about July 9, 14, 16, 21 and the SUBJECT VEHICLE #2 at the Rhodes Avenue Residence on or about

July 8, 9, 12, 13, 14, 15, 16, 18, 19, 21, 22, 24, 25, 26, 28 and 29.

b.   However, SA Reuter's notes record that G. BENHAROSH was seen entering and exiting the Rhodes Avenue Residence on an almost daily basis, including leaving the Rhodes Avenue Residence very early in the morning and arriving at the Rhodes Avenue Residence late at night, evidencing that is where G. BENHAROSH slept.

c.   G. BENHAROSH was observed at the following dates (and approximate times), among others, at the Rhodes Avenue Residence (the "residence"):

On 7/9/10 at 10:42 a.m., a male resembling G. BENHAROSH walked from the residence toward the Cadillac SUV and then the Cadillac SUV left the residence and at 7:16 p.m., G. BENHAROSH exited the residence and walked to the Cadillac SUV;

On 7/12/2010 at 7:33 p.m., a male resembling G. BENHAROSH walked toward the Cadillac SUV and the Cadillac SUV departed the residence; and at 11:15 p.m., a male resembling G. BENHAROSH exited the residence and exited the driveway in the Cadillac SUV;

On 7/13/10, at 6:35 a.m., a male resembling G. BENHAROSH walked toward the Cadillac SUV and the vehicle then departed the residence. At 7:58 a.m., the Cadillac SUV returned to the residence. The driver appeared to resemble G. BENHAROSH. At 11:40 a.m., a male resembling G. BENHAROSH walked toward the Cadillac SUV and the SUV departed the residence. At 1:55 p.m., the Cadillac SUV returned to the residence. A person resembling G. BENHAROSH walked toward the residence. At 2:55 p.m., G. BENHAROSH walked around the residence and down the driveway. G. BENHAROSH walked to the mail box and placed the garbage cans out front. He then walked to the side of the yard and sat down on the patio furniture. G. BENHAROSH appeared to be looking at the mail that arrived. At 6:25 p.m., G. BENHAROSH walked down the driveway toward the street an out of view of the camera. At

6:27 p.m., G. BENHAROSH walked back up the driveway and into the side yard where he sat on the patio furniture.  At 6:51 p.m., G. BENHAROSH walked from the side yard toward the Cadillac SUV. The Cadillac SUV then departed the residence.  At 8:42 p.m., the Cadillac SUV returned to the residence.  G. BENHAROSH walked away from the SUV toward the house.

On 7/14/2010, at 6:30 a.m., G. BENHAROSH walked toward the Cadillac SUV from the residence.  The SUV then departed the residence.  At 7:51 a.m., the Cadillac SUV returned to the residence.  G. BENHAROSH walked from the SUV towards the residence.  At 9:28 a.m., G. BENHAROSH walked from the residence into the side yard.  At 9:29 a.m., two females, near the residence, one resembles S. BENHAROSH.  They walk down the driveway and out of camera view.  At 9:30 a.m., G. BENHAROSH walked toward the residence.  At 11:24 a.m., the **SUBJECT VEHICLE #2** returned to the residence, backing into the driveway.  A female resembling S. BENHAROSH exited the **SUBJECT VEHICLE #2**. At 12:19 p.m., a female resembling S. BENHAROSH walked down the driveway.  Then G. BENHAROSH walked toward the Cadillac SUV. The Cadillac SUV departed the residence.  At 2:01 p.m., G. BENHAROSH walked toward the Cadillac SUV.  An unidentified male followed him toward the vehicle from the residence and entered the passenger side of the SUV.  The Cadillac SUV then departed the residence.  At 5:50 p.m., the Cadillac SUV  back in the driveway.  Unknown time returned and unknown driver.  At 6:29 p.m., G. BENHAROSH walked toward the Cadillac SUV.  The SUV departed the residence.  At 9:10 p.m., the Cadillac SUV returned to the residence.  G. BENHAROSH exited the driver's side and walked toward the residence.

On 7/15/10, at 6:17 a.m., G. BENHAROSH walked toward the Cadillac SUV and entered the driver's seat.  Soon behind him, a young male (possibly the son) walked toward the SUV and entered the passenger side of the SUV.  The SUV departed the residence. At 8:16 a.m., the Cadillac SUV returned to the residence.  The young male passenger and G. BENHAROSH, the driver, are seen exited the vehicle and walked toward the residence.  At 10:22 a.m., the Cadillac SUV departed the residence (Unknown driver). At 2:17 p.m., the Cadillac SUV returned to the residence. G. BENHAROSH exited the driver's seat and walked towards the residence.  At 2:34 p.m., G. BENHAROSH and a young male (possibly the son) walked towards the Cadillac SUV.  G. BENHAROSH entered the driver's seat and the male entered the passenger side of the SUV.  The Cadillac SUV departed the residence.  At  10:39 p.m., the Cadillac SUV returned to the

34

residence.  G. BENHAROSH exited the driver's seat and walked towards the residence.

On 7/16/10, at 6:28 a.m., G. BENHAROSH walked towards the Cadillac SUV from the residence.  The SUV then departed the residence.  At 8:02 a.m., the Cadillac SUV returned to the residence.  G. BENHAROSH, the driver, is seen exiting the vehicle and walking towards the residence.  At 9:23 a.m., a female, resembling S. BENHAROSH walked towards the **SUBJECT VEHICLE #2**.  The **SUBJECT VEHICLE #2** departed the residence.  At 12:48 p.m., G. BENHAROSH walked towards the Cadillac SUV from the residence.  Right behind him a young male and a male child walked towards the SUV.  The SUV then departed the residence. At 1:32 p.m., the Cadillac SUV returned to the residence.  The young male, the male child and G. BENHAROSH exited the SUV and walked towards the house.  At 1:51 p.m., G. BENHAROSH walked towards the Cadillac SUV from the residence.  The SUV then departed the residence.  At 3:12 p.m., the Cadillac SUV returned to the residence.  G. BENHAROSH walked towards the residence.  At 7:28 p.m., a small child walked from the residence out to a bicycle in the front yard.  G. BENHAROSH moves the bicycle and then is seen near the Cadillac SUV. BENHAROSH walked toward the SUV and he opens the rear hatch to put something in.  A young male walked from the residence with a female behind him.  The young male and the young female walk back toward the residence and then back toward the SUV.  The SUV then departed the residence.

On 7/17/10, at 7:26 a.m., G. BENHAROSH walked down the driveway away from the residence; at 9:31 p.m., the Cadillac SUV returned to the residence.  BENHAROSH  exited the driver's side and an unidentified female exited the passenger side of the SUV. They both walked to the residence.

On 7/18/10, at 7:44 a.m., G. BENHAROSH and a young male are walked towards the Cadillac SUV from the residence.  The SUV then departed the residence.  At 9:21 a.m., the Cadillac SUV returned to the residence.  The young male and G. BENHAROSH exited the SUV and walked towards the house. At 7:28 p.m., G. BENHAROSH walked away from the residence and into the side yard. He then walked toward the Cadillac SUV.  At 7:31 p.m., a young male walks towards the SUV from the residence.  The SUV then departed the residence.   At 9:01, the Cadillac SUV returned to the residence.  The young male and G. BENHAROSH exited the SUV and walked towards the house.

On 7/19/10, at 11:41 a.m., G. BENHAROSH walked towards the
Cadillac SUV from the residence.  The SUV then departed the
residence.  At 4:15 p.m., the Cadillac SUV returned to the
residence.  BENHAROSH walked down the driveway to the mailbox
and taking mail back up toward the residence.  At 5:47 p.m., G.
BENHAROSH and one of his sons walked towards the **SUBJECT
VEHICLE.**  The **SUBJECT VEHICLE #2** departed the residence.  The
driver is not observed due to camera problems.  At 6:01 p.m.,
the **SUBJECT VEHICLE #2** returned to the residence.  The driver
was the female who departed in the Cadillac SUV earlier.  At
6:34 p.m., the Cadillac SUV returned to the residence.  G.
BENHAROSH and his son walked towards the residence.  At 8:00
p.m., G. BENHAROSH walked down the driveway carrying something
in his hands, towards the Cadillac SUV.  His son followed close
behind.  The SUV departed the residence.

On 7/20/10, at 9:44 a.m., the Cadillac SUV returned to the
residence.  G. BENHAROSH and son walked up the driveway to the
residence.

On 7/21/10, at 3:23 p.m., the Cadillac SUV returned to the
residence.  G. BENHAROSH exited the driver's side and a young
male exited the passenger side.  G. BENHAROSH waited near the
vehicle while the young male walked down the driveway out of
view.  Then he walked back up the driveway with what appears to
be mail and they both walk toward the residence.  At 4:33 p.m.,
G. BENHAROSH walked toward the Cadillac SUV.  The SUV departed
the residence.  At 5:35 p.m., the **SUBJECT VEHICLE #2** returned to
the residence (Driver is not observed).  At 5:54 p.m., a young
boy in the front of the residence.  Soon after, a woman who
appears to be S. BENHAROSH walked towards the **SUBJECT VEHICLE
#2.**  They both get in the **SUBJECT VEHICLE #2**and depart the
residence.  At 9:00 p.m., the Cadillac SUV returned to the
residence.  G. BENHAROSH walked up the driveway to the
residence.

On 7/22/10, at 6:15 a.m., G. BENHAROSH walked towards the
Cadillac SUV.  The SUV then departed the residence.  At  8:10
a.m., the Cadillac SUV returned to the residence.  G. BENHAROSH
walked up the driveway to the residence.  At 7:29 p.m., G.
BENHAROSH and a female walked toward the Cadillac SUV.
Benharosh entered the driver's side of the SUV and the female
walked back to the house.  The SUV departed the residence.

On 7/23/10, at 12:14 a.m., the Cadillac SUV  returned to
the residence.  The driver is not identified as he/she exits the
vehicle and walked away from the residence.  About a minute

later, G. BENHAROSH walked toward the residence. A few seconds behind, four females and one male walked to the front of the residence. At 6:30 a.m., G. BENHAROSH walked towards the Cadillac SUV. The SUV then departed the residence. At 7:42 a.m., the Cadillac SUV returned to the residence. G. BENHAROSH walked toward the residence.

On 7/24/10, at 9:41 p.m., the Cadillac SUV was parked in the driveway. A male driver walked from the Cadillac, down the driveway to the mailbox and then back toward the residence.

On 7/25/10, at 7:55 a.m., G. BENHAROSH and a young male walked away from the residence towards the Cadillac SUV. The Cadillac then departed the residence. At 9:33 a.m., the Cadillac SUV returned to the residence. G. BENHAROSH (the driver) and a young male exited the vehicle and walked to the front of the residence. At 9:12 p.m., G. BENHAROSH walked away from the residence towards the Cadillac SUV. The Cadillac then departed the residence. At 11:09 p.m., the Cadillac SUV returned to the residence. G. Benharosh (the driver) exited the vehicle and walked to the front of the residence.

On 7/26/10, at 6:13 a.m., G. BENHAROSH and a young male walked away from the residence towards the Cadillac SUV. The Cadillac then departed the residence. At 8:50 a.m., the Cadillac SUV returned to the residence. G. BENHAROSH (the driver) and the young male passenger exited the vehicle and walked to the front of the residence. At 11:20 p.m., G. BENHAROSH walked from behind the **SUBJECT VEHICLE #2** up the driveway towards the residence.

On 7/27/10, at 12:08 a.m., the Cadillac SUV returned to the residence. A young male walked toward the residence. An unidentified female driver walked to the residence right after. At 1:36 p.m., G. BENHAROSH walked away from the residence toward the Cadillac SUV.  The Cadillac then departed the residence.

7/28/10, at 7:08 p.m., G. BENHAROSH (white shirt, white hat) and an unidentified male (wearing a black shirt and carrying a folder) are observed walked up the driveway and to the front of the residence. At 7:29 p.m., a female in black short sleeve shirt walked from the house to the **SUBJECT VEHICLE #2**. A young male walked to the passenger side of the **SUBJECT VEHICLE #2**. The **SUBJECT VEHICLE #2** departed the residence. At 8:59 p.m., a vehicle (believed to be the Cadillac SUV) returned to the residence. The driver, G. BENHAROSH, and the passenger, a young male walked to the front of the residence.

7/29/10, at 6:24 a.m., G. BENHAROSH walked from the front of the residence to the Cadillac SUV.  At 8:10 a.m., the Cadillac SUV  returned to the residence.  G. BENHAROSH (the driver) exited the vehicle and walked to the front of the residence.

54.  The evidence from the pole camera demonstrated that during the entire month of July 2010, S. Benharosh lived with G. BENHAROSH at the Rhodes Avenue address and LEVI did not live at the Rhodes Avenue address.

55.  The following surveillance also demonstrates that S. Benharosh and LEVI do not reside together:

a.  On December 4, 2009, law enforcement investigators conducting surveillance at the Rhodes Avenue Residence observed G. BENHAROSH entering the residence at approximately 7:45 a.m.  Throughout the day, law enforcement investigators observed G. BENHAROSH depart and return to the residence, and enter the residence as if he resided there.

b.  On April 9, 2010, law enforcement officers conducting surveillance at Rhodes Avenue Residence observed G. BENHAROSH and S. BENHAROSH exit their residence, enter into a gray Bentley bearing California license plate number 6KFG377, and travel to **SUBJECT PREMISES #3**.  Officers subsequently observed G. BENHAROSH and S. Benharosh walk out of the synagogue holding hands.  The same surveillance officers observed G. BENAHROSH and S. BENHAROSH walk in the direction of the Rhodes

Avenue Residence holding hands.  G. BENHAROSH and S. BENHAROSH,
holding hands gave an appearance that they were a married
couple.

    c.  On July 20, 2010, law enforcement agents observed
G. BENHAROSH depart the Rhodes Avenue Residence at approximately
640 a.m., and subsequently observed S. BENHAROSH depart the
residence later that day.  On the same date, agents observed
LEVI leave **SUBJECT PREMISES #3** in a vehicle with an unidentified
male and travel to 5331 Corteen Place, Valley Village, CA.

    56.  Additionally, I know from law enforcement officers
conducting surveillance at **SUBJECT PREMISES #3** that G. BENHAROSH
appears to be a leader at the synagogue where LEVI is a member.
Based on observations concerning their interaction, G. BENHAROSH
and LEVI appear to be good friends and members of the same
synagogue.

<u>BACKGROUND ON MARRIAGE FRAUD INVESTIGATIONS</u>

    57.  I have also learned about the operation and indicators
of a marriage fraud scheme from my co-case agent in this
investigation, Diane Booker, Special Agent, ICE, who has more
than 25 years total experience, at ICE (since 2003) and its
predecessor agency, INS.  SA Booker has conducted hundreds of
interviews to establish or investigate whether the marriage of
an applicant for lawful permanent residence status was
legitimate or a fraud to obtain a change in immigration status.
These interviews are also referred to as "adjustment-of-status

interviews," which are now conducted by personnel from ICE, U.S. Citizenship and Immigration Services ("USCIS").

58. From my discussion with SA Booker, my own common sense and experience, I know that persons who enter a purportedly legal marriage solely as a means to obtain a change of immigration status for one spouse, often (1) do not live together at the same residence while purportedly married; (2) are not or are very seldom, observed at the same residence while purportedly married; (3) cannot remember or recall prior recent addresses of where they claim to previously have lived together while married, including at residences in documents submitted to ICE; and (4) cannot remember basic information about their purported spouse, including birthdays, dates of marriage, etc . . . that one would expect to be known by a spouse who has been married for the respective duration of time, among other indicators.[20] Additionally, it is not uncommon for marriage

---

[20] Based on my training and experience and information conveyed to me by agents and others involved in investigating fraudulent marriage schemes, I know that petitioners are United States citizens who agree to participate in fraudulent marriages with beneficiaries, sponsor immigrant visa petitions on their behalf, and attend adjustment-of-status interviews in support of those petitions. For their services, petitioners are often friends or colleagues or associates or the beneficiaries or the family of the beneficiaries.

Additionally, I know from my training and experience and from information learned from other law enforcement investigators and adjudication officers that United States citizens are willing to enter into fraudulent marriages to foreign nationals to confer legal permanent resident status to the foreign national for remuneration, for reasons of compassion, or ignorance of the visa petition process. The petitioner and/or beneficiary will falsify documents and stage family photographs to support the immigrant

fraudsters to provide ICE or USCIS with documentation that purports to evidence their marriage, such as statements of a joint bank account, marriage certificates, account statements from utility companies, lease agreements in the names of both spouses, etc . . . . in order to appear in a legitimate marriage.

### IN THE FALL 2010, S. BENHAROSH, THROUGH LEVI, APPLIED FOR AN ADJUSTMENT OF IMMIGRATION STATUS

59.  On or about September 13, 2010, a Form G-28, Notice of Entry of Appearance as Attorney or Accredited Representative, was purportedly signed by S. BENHAROSH[21] with an address of 12160 Burbank Blvd., #1, North Hollywood, CA, 91607 and A# XXX-XXX-218.

60.  On or about October 18, 2010, approximately, one month before the below described interview with USCIS, HSI SAs observed G. BENHAROSH and S. BENHAROSH move from the Rhodes Avenue Residence to 12160 Burbank Avenue, North Hollywood (Valley Village), California ("12160 Burbank Avenue residence"). HSI SAs observed both S. BENHAROSH and G. BENHAROSH giving directions to the movers.  According to surveillance personnel,

---

visa petitions and to make the marriages appear legitimate. The petitioner and beneficiary will also rehearse questions and answers concerning their marriage that they believe DHS officers will ask during their visa petition interview. Also, the beneficiary will remain in a bona fide marriage with their ex-spouse because of their devotion to that marriage.

[21] I am familiar with the signatures of S. BENHAROSH based on my review of DHS documents, CADL of S. BENHAROSH, and checks purportedly signed by S. BENHAROSH on a checking account (Bank of America account number xxxxx-xx067) in the name of S. BENHAROSH and LEVI.

the 12160 Burbank Avenue residence is a one story structure that contains a few small apartments.

### THE INTERIEW BY USCIS

61.  On November 22, 2010, S. BENHAROSH and R. LEVI were interviewed by Juanita Quintero, an Immigration Service Officer ("ISO") employed by DHS, USCIS, Los Angeles Field Office, in Los Angeles, California.  ISO Quintero conducts adjudication immigration interviews of certain applicants seeking lawful permanent resident status in the United States, among other duties.  The November 22, 2010 interview was recorded by video and audio and was several hours in length.  I have reviewed portions of these recordings and I have reviewed the notes taken by ISO Quintero during the interviews.  My descriptions of the aforementioned interviews are not a verbatim account of the statements made by S. BENHAROSH and LEVI to ISO Quintero and is a description of the statements made by them, unless otherwise indicated.  Rough draft transcripts of the interviews have been completed.

62.  The purpose of the interviews of S. BENHAROSH and LEVI, in part, was for ISO Quintero to obtain accurate information about and evaluate the legitimacy of the purported marriage between S. BENHAROSH and LEVI to aid in the decision making process of USCIS about their application seeking lawful

permanent resident status in the United States for S. BENHAROSH
and her children.

63.   Prior to the interview, S. BENHAROSH and LEVI were
advised of their rights, including their right to have an
attorney present and that they were free to leave at anytime.
S. BENHAROSH and LEVI both signed a waiver to proceed with the
interviews without the presence of an attorney.   They were both
placed under oath by ISO Quintero and they both acknowledged the
oath.   After the oath, S. BENHAROSH and LEVI were interviewed
separately.   S. BENHAROSH was interviewed first.   S. BENHAROSH
has a heavy Israeli accent and, during the interview, she
frequently requested that questions be repeated or explained
because, as she claimed, her understanding of English was not so
good.

64.   In response to a question to provide all prior
addresses whereat LEVI and S. BENHAROSH resided together since
being married, S. BENHAROSH indicated that she and LEVI first
lived together at a residence on Wilkinson Avenue [in Valley
Village, California] ("Wilkinson Avenue Residence") after being
married.   (According to their I-130 application filed on or
about August 12, 2010, they were married on November 14, 2008 in
Van Nuys, California.[22])   Also, S. BENHAROSH indicated that she

---

[22] During the interview, both S. BENHAROSH and LEVI denied living
together prior to their purported marriage.

next lived with LEVI for one year at the "Rhodes" Avenue
Residence, [North Hollywood, California].  S. BENHAROSH
indicated that about one and half months prior the interview,
namely, on or about September 20, 2010, she and LEVI moved into
a residence at [12160] Burbank Blvd., North Hollywood,
California ("Burbank Blvd. Residence").

     65.  During his interview, in response to a question to
provide all prior addresses whereat LEVI and S. BENHAROSH
resided together since being married, LEVI, initially, only
could recall that they lived together at a residence on
"Wilkinson" and could not remember the street number or zip
code.  LEVI then indicated they moved to another address close
to a synagogue but could not provide the address.  LEVI did not
mention the Rhodes Avenue Residence based on my review of
materials.  LEVI indicated that (approximately) two months prior
to the interview (namely, September 2010), he and S. BENHAROSH
moved into the Burbank Blvd. Residence.   Also, about a half
hour into the interview of LEVI, LEVI began to converse with the
interviewer in the Spanish language.   I am not fluent in the
Spanish language and did not understand what was being said in
the Spanish language but, now, I have been provided with a very
rough draft of a transcript of the interview, including a rough
translation of the parts of the interview conducted in Spanish.

66.  In response to a question about the current residence of her ex-spouse, namely, G. BENHAROSH, S. BENHAROSH indicated that she did not know where G. BENHAROSH lived specifically but only that G. BENHAROSH lived somewhere in Sherman Oaks, California.  Also, S. BENHAROSH indicated that she has not been to G. BENHAROSH's residence nor did she know his address. Initially, during the interview, S. BENHAROSH made statements indicating that she rarely, if ever, sees G. BENHAROSH but, later in the interview, admitted that she sees G. BENHAROSH, once a week at a synagogue.  In fact, during the interview, S. BENHAROSH made statements that indicated G. BENHAROSH had only visited S. BENHAROSH's residence in the past to pick-up their children.  S. BENHARSOH indicated that the children met G. BENHAROSH in the street when G. BENHAROSH picked them up.

67.  During the interview both S. BENHAROSH and LEVI claimed that they currently live together with her four children at the Burbank Blvd. Residence.  However, LEVI indicated that S. BENHAROSH and LEVI slept in the living room while the girls slept in one bedroom and the boys slept in the other bedroom. In response to virtually the same question, S. BENHAROSH indicated that she and LEVI slept in one bedroom, the girls slept in the other bedroom and a boy slept in the living room. Additionally, LEVI did not know where any of the four children

45

purportedly living with LEVI attended school or their grade levels.

68.  During the interview, S. BENHAROSH stated she married LEVI on October 29, 2008.  During the interview, LEVI stated he married S. BENHAROSH on July 29, 2008.  According to their I-130 application filed with USCIS on or about August 12, 2010 and License and Certificate of Marriage filed with County of Los Angeles, County Clerk, S. BENHAROSH and LEVI were married on November 14, 2008 in Van Nuys, California.

69.  Also, I noticed the following, which indicated to me, taken together with the totality of the interviews, that S. BENHAROSH and LEVI were not in a legitimate marriage: (a) S. BENHAROSH kept her ex-husband's last name and did not take LEVI's or revert back to her maiden name; (b) no wedding rings on the right or left hand of S. BENHAROSH but, possibly, one on LEVI; (c) LEVI misstated the day and the year of the birth of S. BENHAROSH; (d) S. BENHAROSH stated that they jointly and sometimes individually pay the bills but LEVI claimed that S. BENHAROSH paid all the bills.

70.  Based on the totality of the investigation, during their November 22, 2010 interview with ISO Quintero, I believe that, under oath, S. BENHAROSH and LEVI intentionally made the following false statements, among others, that had a natural tendency to influence or was capable of influencing USCIS's

decisions or activities: that (a) at the time of the interview,
LEVI and S. BENHAROSH lived together and (b) at the time of the
interview, LEVI and S. BENHAROSH lived together at 121650
Burbank [Blvd.], North Hollywood (Valley Village), CA.
Further, based on the totality of the investigation, during
their November 22, 2010 interview with ISO Quintero, I believe
that, under oath, that S. BENHAROSH intentionally made the
following false statements, among others, that had a natural
tendency to influence or was capable of influencing USCIS's
decisions or activities: (c) at the time of interview, that G.
BENHAROSH lived in somewhere in Sherman Oaks, [California]; and
(d) at the time of the interview that S. BENHAROSH did not know
the address of G. BENHAROSH. Furthermore, based on the totality
of the investigation, during their November 22, 2010 interview
with ISO Quintero, I believe that, under oath, that LEVI
intentionally made the following false statements, among others,
that had a natural tendency to influence or was capable of
influencing USCIS's decisions or activities: (e) at the time of
the interview, that LEVI lived with four of S. BENHAROSH's
children; and (f) at the time of the interview, that LEVI and S.
BENHAROSH slept together in a living room while the children of
S. BENHAROSH slept in two bedrooms.  The truth, as both S.
BENHAROSH and LEVI well knew at the time of the interview, was
that S. BENHAROSH lived with G. BENHAROSH and their four

children at the 12160 Burbank Avenue residence; and LEVI lived at **SUBJECT PREMISES #2**.

### POST-INTERVIEW SURVEILLANCE

71.    Following the interview, HSI SAs observed S. BENHAROSH drive the **SUBJECT VEHICLE #2** alone from the USCIS Los Angeles Field Office to 12160 Burbank Avenue, North Hollywood (Valley Village) residence.

72.    On November 22, 2010, following the interview, HSI SAs conducted surveillance on S. BENHAROSH and LEVI. During her interview, S. BENHAROSH claimed that she was going to drive LEVI to work in downtown Los Angeles and that she did not know the address of his work.  However, HSI SAs observed that following the interview another female (believed to be Lilia Lutotsky), driving a white VW Jetta, picked-up LEVI outside the USCIS Los Angeles Field Office, located at 300 N. Los Angeles Street. LEVI and the female went to lunch and went to downtown Los Angeles, near Main Street and 15th Street.  That afternoon, HSI SAs observed the female in the white Jetta drop LEVI off at **SUBJECT PREMISES #2**.  At 7:34 p.m., HSI SAs observed the female driving the white Jetta go into the apartment complex of **SUBJECT PREMISES #2**.  HSI SAs stayed at this location until 9:00 p.m. and did not observe LEVI leave **SUBJECT PREMISES #2**.

73.    According to DMV records, a driving citation was issued to Lilia Lutotsky (citation no. XXXX446 in a 2009 Jeep,

black in color, with License Plate No. XXDD164) on or about May 12, 2010. The citation indicated that Lutotsky's residence is **SUBJECT PREMISES #2**. Based on the totality of the investigation, I believe that on November 22, 2010, Lilia Lutotsky, not S. BENHAROSH, was living with LEVI and that LEVI and Lutotsky lived at the **SUBJECT PREMISES #2**.

<u>S. BENHAROSH'S AND LEVI'S SUPPLEMENTAL FILINGS WITH USCIS</u>

74. On or about November 22, 2010, USCIS, requested, by letter, additional documentation from S. BENHAROSH and LEVI as proof of their marriage, including (a) checking account(s) information and cancelled checks for one year; (b) rental agreement and application for their current residence; (c) rental agreement for previous residence(s); (d) copy of life insurance policy; (e) information of health insurance; (f) insurance records for all vehicle owned by either of them; (g) provide utility statements from current residence, i.e., water, electric, gas and phone; and (h) provide divorce decree, including the interlocutory decree showing custody of the children.

75. According to DHS records, on November 29, 2010, attorney John Perry sent a letter to USCIS, Los Angeles Field Office, in support of S. BENHAROSH's application for adjustment of immigration status, that attached (a) Bank of America bank account statements for account XXXXX-XXX67 in the name of S.

BENHAROSH and LEVI for the time frame of October 27, 2009 to November 23, 2009 [address of 5914 Wilkinson Avenue, Valley Village, Ca 91607] and November 24, 2009 through December 24, 2009, April 27, 2010 to October 25, 2010 [address of the Rhodes Avenue Residence], (b) divorce papers, (c) agreement between S. BENHAROSH and LEVI and Odelia Atia (Landlord who has the same address as the Rhodes Avenue Residence) dated May 21, 2009, for the lease of the Rhodes Avenue Residence from June 9, 2010 to June 9, 2012 with a payment "received" of $25,000, (d) agreement between S. BENHAROSH and LEVI and Leon Tyrangiel (Landlord) dated October 18, 2010 for a month to month lease of 12160 Burbank Blvd., #1, North Hollywood, CA 91607 ("Burbank Blvd. Residence"), and (e) utility bills for the Rhodes Avenue Residence and the Burbank Blvd. Residence.  I note that the several dozen bank checks submitted to USCIS, including checks to utility companies, all appeared to be signed by S. BENHAROSH. Some of the utility bills for the Rhodes Avenue Residence and all of the utility bills for the Burbank Blvd. Residence are in the name of both S. BENHAROSH and LEVI.

76.  According to the LAPD, on December 1, 2010, per DWP records, utility service under the name "Gavriel Benharosh" began at the **SUBJECT PREMISES #1**.

50

77.  On or about December 9, 2010, at approximately 10:20 a.m.[23], per LAPD surveillance log, LAPD officers observed **SUBJECT VEHICLE #1** (which LAPD officers had previously seen being driven by G. BENHAROSH) parked in front of **SUBJECT PREMISES #1** and **SUBJECT VEHICLE #3** parked across the street from **SUBJECT PREMISES #1**.  At 1:15 p.m., LAPD officers, G. BENHAROSH arrived in **SUBJECT VEHICLE #2** and parked **SUBJECT VEHICLE #2** in the driveway of **SUBJECT PREMISES #1**.

78.  On December 16, 2010, at 11:25 a.m., LAPD surveillance observed S. BENHAROSH and G. BENHAROSH drive together in **SUBJECT VEHICLE #2** from **SUBJECT PREMISES #3** to a large wholesale store named "Costco," located at 6100 Sepulveda Blvd.  They shopped separately and purchased meat, wine and toiletries.  After shopping, G. BENHAROSH then drove **SUBJECT VEHICLE #2** with S. BENHAROSH in the passenger seat back to **SUBJECT PREMISES #3**.  At **SUBJECT PREMISES #3**, G. BENHAROSH loaded some items from **SUBJECT VEHICLE #2** into **SUBJECT VEHICLE #1** and S. BENHAROSH brought some items from **SUBJECT VEHICLE #2** into **SUBJECT PREMISES #3**.  Then, at 12:35 p.m., G. BENHAROSH, drove **SUBJECT VEHICLE #1**, alone, to **SUBJECT PREMISES #1**, while being followed by S. BENHAROSH, who was driving **SUBJECT VEHICLE #2**, alone.  At **SUBJECT PREMISES #1**, G. BENHAROSH entered the residence while S. BENHAROSH unloaded groceries from **SUBJECT VEHICLE #2** (parked on

---

[23] All times contained in the affidavit are approximations.

the driveway) and brought the groceries into **SUBJECT PREMISES #1**. At 1:10 p.m., G. BENHAROSH drove from **SUBJECT PREMISES #1** to **SUBJECT PREMISES #3**. At 2:00 p.m., G. BENHAROSH was observed locking the front door of **SUBJECT PREMISES #3** with a key and drove **SUBJECT VEHICLE #1** to **SUBJECT PREMISES #1** and entered the residence where he remained until 4:10 p.m. when he drove **SUBJECT VEHICLE #1** back to **SUBJECT PREMISES #3**.

79. On December 16, 2010, at 5:25 p.m., LEVI, who was driving a Chevrolet Lumina, and G. BENHAROSH were seen together by LAPD surveillance in the parking lot of **SUBJECT PREMISES #3** looking under the hood of the Chevrolet Lumina. At 5:45 p.m., LEVI put the hood down on the Chevrolet Lumina. Around this time, G. BENHAROSH and a young boy, drove in **SUBJECT VEHICLE #1** to **SUBJECT PREMISES #1**, entered the residence. G. BENHAROSH was not observed exiting **SUBJECT PREMISES #1** when surveillance was terminated at 9:00 p.m. At 6:20 p.m., S. BENHAROSH exited the residence and left in **SUBJECT VEHICLE #2** and then returned to the residence at 7:55 p.m. in **SUBJECT VEHICLE #2**.

80. Neither LEVI, **SUBJECT VEHICLE #4** nor the Chevrolet Lumina were observed at **SUBJECT PREMISES #1** at anytime during surveillance in December 2010.

81. On December 17, 2010, LAPD surveillance observed the **SUBJECT VEHICLE #1** at **SUBJECT PREMISES #3** at 6:30 a.m. At 6:45 a.m., 7:45 a.m., 1:15 p.m., either S. BENHAROSH and/or **SUBJECT**

VEHICLE #2 were seen at SUBJECT PREMISES #3.  At 9:00 a.m. and
1:35 p.m., G. BENHAROSH (and SUBJECT VEHICLE #1) was seen at
SUBJECT PREMISES #1 either entering or exiting the residence.
At 9:05 a.m., S. BENHAROSH exited the SUBJECT PREMISES #1, drove
away in SUBJECT VEHICLE #1 with a young boy and returned to the
residence.  At 9:20 a.m., S. BENHAROSH and G. BENHAROSH drove
from the residence in SUBJECT VEHICLE #1 to a fitness gym in
Sherman Oaks whereat S. BENHAROSH exited the vehicle and entered
the gym.  Also, that morning, G. BENHAROSH in SUBJECT VEHICLE #1
and a teen age girl in SUBJECT VEHICLE #2 were seen driving in
tandem to SUBJECT PREMISES #1.

      82.  On December 22, 2010, between 7:00 a.m. 7:40 a.m.,
LAPD officers[24] observed SUBJECT VEHICLE #4 and LEVI at the
SUBJECT PREMISES #3.  At 7:45 a.m., LEVI drove SUBJECT VEHICLE
#4 to a store with a companion, and then drove, alone, to the
apartment complex at SUBJECT PREMISES #2 and entered SUBJECT
PREMISES #2 at 8:10 a.m.  At 9:25 a.m., an older female (50 to
55 years old) and a younger female (15 to 25 years old) exited
the SUBJECT PREMISES #2 and drove away in SUBJECT VEHICLE #4.
At 11:45 a.m., on the balcony of SUBJECT PREMISES #2, LEVI waved
to an individual in a Black VW sedan on the street below, and,
later, LEVI exited SUBJECT PREMISES #2 and entered the Black VW

---

[24] The term "LAPD officers" used in this affidavit means one or
more LAPD personnel, including an officer or detective.

sedan.  Between 11:50 a.m. until surveillance terminated at 2:00 p.m., LEVI and the individual travelled to a discount jewelers, a wholesale banner store in South El Monte, CA, a warehouse and a fashion store in downtown Los Angeles.

83.  On December 23, 2010, LAPD surveillance observed at 6:00 a.m. that G. BENHAROSH appeared to be entering **SUBJECT VEHICLE #1** at **SUBJECT PREMISES #1** while SUBJECT VEHICLE #2 was parked in the driveway.  At 8:15 a.m., G. BENHAROSH drove **SUBJECT VEHICLE #1** to and entered **SUBEJCT PREMISES #1**.  At 9:15 a.m., S. BENHAROSH drove **SUBJECT VEHICLE #2** to **SUBJECT PREMISES #1** and unloaded groceries and brought them into the residence.

84.  Also, On December 23, 2010, surveillance by ICE SAs observed identified a female in a white Jetta (License plate # 6GBV160) fitting the description of Lilia Lutotsky (who I believe is LEVY's live-in significant other) driving away from the apartment complex at **SUBJECT PREMISES #2**.

SUBJECT VEHICLE #3

85.  As reported in DEA SA Reuter's notes and my own partial review of the video from the pole camera in front of the Rhodes Avenue Residence during July 2010 and August 2010, **SUBJECT VEHICLE #3**, registered to Alon Group with an address at the SUBJECT PREMISES #3, was parked near at the Rhodes Avenue Residence virtually every day and overnight at curbside or in the driveway.  On November 18, 2010, LAPD observed the **SUBJECT**

**VEHICLE #3** on Burbank Blvd., near 12160 Burbank Blvd, Valley Village, CA, a known prior residence of G. BENHAROSH and G. BENHAROSH.  On or about December 9, 2010, at approximately 10:20 a.m., per LAPD surveillance log, LAPD officers observed **SUBJECT VEHICLE #1** (which LAPD officers had previously seen being driven by G. BENHAROSH) parked in front of **SUBJECT PREMISES #1** and **SUBJECT VEHICLE #3** parked across the street from **SUBJECT PREMISES #1.** Based on the totality of my investigation, I believe that **SUBJECT VEHICLE #3** is the primary vehicle of E. Ben Harosh (DOB: 1993).  Both G. BENHAROSH and LEVI have attempted to gain immigration status, under false pretenses, for E. Ben Harosh.  As such, immigration paper work may be within **SUBJECT VEHICLE #3:**

SYNAGOGUE

86.  According to the State of California, Secretary of State, official website (http://kepler.sos.ca.gov/cbs.aspx), on September 23, 2005, the agent for service of process for **SUBJECT PREMISES #3**, then called "Israel Achmin," was LEVI and, on April 19, 2007, the agent for service of process for **SUBJECT PREMISES #3**, now called "Gavriel Israel Achim," was G. BENHAROSH. According to a recognized corporation website (http://www.corporationwiki.com), "Gabriel Ben Harosh," was the registered agent of "Gavriel Israel Achim" that was located at **SUBJECT PREMSIS #3** and was currently active.

55

87.  On April 21, 2007 an application and signature card from East-West Bank was signed with a signature of G. BENHAROSH for an account in the name "Gavriel Israel Achim" with an address of **SUBJECT PREMISES #3** and phone numbers of 818-762-4505 and 818-232-2430.  Moreover, on the aforementioned application and signature card, G. BENHAROSH used the social security number (XXX-XX-X506) and DMV CADL (E1XXXX28) that he obtained by false pretenses and the birth date of August 20, 1958 that belonged to New Jersey Ben Harosh.

88.  An IRS Form SS-4 (Application for Employer Identification Number ("EIN")), signed under penalty of perjury by G. BENHAROSH and dated April 30, 2007, that requested an EIN from the IRS for "Gavriel Israel Achim" with an address at the **SUBJECT PREMISES #3** stated G. BENHAROSH's SSN was XXX-XX-X506 and phone number was 818-232-2430.   Thus, bank documents pertaining to **SUBJECT PREMISES #3** contain evidence of G. BENHAROSH's OFFENSES.

89.  According to DEA SA Reuter, on or about September 21, 2010, DEA SAs Reuter and Joseph Bryson met with G. BENHAROSH inside **SUBJECT PREMISES #3.**  SA Reuter's notes, diagram and information indicate the following: The interior of **SUBJECT PREMISES #3** is, approximately, between 1000 and 1500 square feet.  The main entrances that face Burbank Boulevard lead into a large open room that occupy well over half of **SUBJECT PREMISES**

**#3** and used, apparently, for religious services.  In a rear corner of the interior of the premises is an enclosed office that is immediately adjacent to an exit ("Office") that leads to an alley in the back of premises (where **SUBJECT PREMISES #4** is located, namely the off-white container).  On September 21, 2010, G. BENHAROSH acknowledged to SA Reuter that the Office within **SUBJECT PREMISES #3** was G. BENHAROSH's office and the Office contained pictures of BENHAROSH's children.

90.  Also, information from SA Reuter indicated the following:  On September 21, 2010, G. BENHAROSH met with SAs Reuter and Bryson in his Office.  The Office is rectangular shaped with a desk that G. BENHAROSH sat behind during meeting.  On the desk, SA Reuter observed mail (including mail in the names of other persons); papers, primarily in the Hebrew language but also some in English; and two cell phones that G. BENHAROSH used during the meeting.  The papers included DMV vehicle registration/stickers for the year 2010 with the last name of Benharosh (or variation thereof – first name was covered) for a 2008 GMC vehicle with an address of the **SUBJECT PREMISES #3**.  Another desk in the Office that was near a wall of the Office had a folder for paperwork and other cabinets within the Office appeared to be of the type that could be used to store paperwork.

91.  Notably, per SA Reuter: next to the desk that G.
BENHAROSH sat behind during the meeting was a cabinet on which
sat a security monitor.  SA Reuter noticed a camera mounted in a
hallway inside **SUBJECT PREMISES #3** that was pointed at the
entrance of the Office.  The remaining approximate four enclosed
spaces in the **SUBJECT PREMISES #3** that could be observed by SA
Reuter appeared to consist of (1) a bathroom, (2 and 3) two
unknown areas (possibly storage spaces) and (4) a kitchen.

92.  Shortly before the September 21, 2010 meeting, in a
telephone conversation, G. BENHAROSH informed SA Reuter that he
was always at his house or the synagogue.  Given G. BENHAROSH's
control of and security of SUBJECT PREMISES #3 and that G.
BENHAROSH conducts personal and other non-Synagogue business
through SUBJECT PREMISES #3, I believe there is probable cause
to believe that evidence of violations of G. BENHAORSH's
OFFENSES and S. BENHAROSH's OFFENSES will be found at the
**SUBJECT PREMISES #3.**[25]

93.  Myself and co-case agent SA Booker will be in charge
of the execution of the search warrants named herein.  In order

---

[25] The account statements from East-West Bank from August 2007 to
June 2008 and the account statements from Bank of America from
November 2009 to August 2010 for the accounts of G. Benharosh's
construction company, Amir Elad USA, Inc., were sent to the
**SUBJECT PREMISES #3.**  Also, the account statements from Bank of
America in the year 2010 for the accounts of other businesses,
such as "Alon Group, Inc."  **SUBJECT VEHICLES #1 and #2** are
registered to **SUBJECT PREMISES #3.**

to be respectful, we plan to execute the search warrant of **SUBJECT PREMISES #3** at a time when formal services are not being conducted, based on our surveillance. Excluded from the search of **SUBJECT PREMISES** #3 will be, (1) the main ceremonial area, that is described in Attachment C hereto as "Main Area"; (2) the kitchen area, that is described in Attachment C hereto as "Kitchen"; and (3) any restrooms.

<u>STORAGE CONTAINER ADJACENT TO SUBJECT PREMISES #3</u>

94.   Also, during the meeting, G. BENHAROSH informed SA Reuter that **SUBJECT PREMISES #4** was his.   Based on my own observations, on or about December 29, 2010, in the morning, I drove through the alley and saw the container.   Generally, the SUBJECT PREMISES, which is described in attachment A, is an off white shipping container immediately adjacent to the back door of SUBJECT PREMISES #4 and is 15 foot long, by 8 ½ feet tall and 8 feet wide a two door entrance and a cylinder lock.   Per SA Reuter, G. BENHAROSH met with SA Reuter in G. BENHAROSH's office within **SUBJECT PREMISES #1.**

<u>ISSUANCE OF A TRACKER</u>

95.   On December 17, 2010, at 5:25 p.m., the Honorable Frederick F. Mumm, Magistrate Judge of the United States District Court for the Central District of California, issued a warrant for the installation and use of a tracking device on the SUBJECT VEHICLE.   However, on December 17, 2010, after the

issuance of the of the aforementioned warrant, AUSA J. Mark
Childs noticed the warrant was defective because it had the
wrong California License plate number identified for the Subject
Vehicle.[26]  On December 20, 2010, the Honorable Frederick F.
Mumm, Magistrate Judge of the United States District Court for
the Central District of California, after finding probable
cause, issued a warrant for the installation and use of a
tracking device on the SUBJECT VEHICLE.

96.  On December 21, 2010, at approximately 12:01 a.m., HSI
SA Dolan placed the tracking device on **SUBJECT VEHICLE #2**.  A
report was compiled of the tracking device which showed the
location of **SUBJECT VEHICLE #2** every hour since it was placed on
December 21, 2010 until January 3, 2011 at approximately 4:31
p.m.  During this time, according to the tracking information,
(a) every day, multiple times a day and always overnight,
**SUBJECT VEHICLE #2** was at **SUBJECT PREMISES #1**; and (b) **SUBJECT
VEHICLE #2** was never at **SUBJECT PREMISES #3**, except on a single

---

[26]    AUSA J. Mark Childs notified me of this development and
instructed me not to place the tracker on the **SUBJECT VEHICLE
#2**.  Consequently, no law enforcement personnel placed a tracker
on the **SUBJECT VEHICLE #2** until a new search warrant was issued.
I have reviewed photographs from surveillance and records from
the DMV regarding **SUBJECT VEHICLE #2**.  Based on this
information, I confirmed that **SUBJECT VEHICLE #2** is a Jeep
Laredo with California license plate number 6MCZ728.  I
identified the correct license plate number in my prior
affidavit but the face sheet for the previous warrant and the
face sheet for my prior affidavit contained the incorrect
license plate number.

occasion on December 30, 2010 at approximately 4:31 p.m. **SUBJECT VEHICLE #2** went in the vicinity of **SUBJECT PREMESIS #3**. However, on December 30, 2010 at approximately 3:31 p.m., **SUBJECT VEHICLE #2** was at the **SUBJECT PREMISES #1** and, at approximately 5:31 p.m. the vehicle was at 13798 Riverside Drive, Sherman Oaks, CA.

## TRAINING AND EXPERIENCE ON DIGITAL DEVICES

97. As used below, the term "digital device" includes any electronic system or device capable of storing and/or processing data in digital form, including: digital cameras; cellular telephones; smart telephones; central processing units; laptop or notebook computers; personal digital assistants; wireless communication devices such as telephone paging devices, beepers, and mobile telephones; peripheral input/output devices such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices such as modems, cables, and connections; storage media such as hard disk drives, floppy disks, compact disks, magnetic tapes used to store digital data (excluding analog tapes such as VHS), and memory chips; and security devices. Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in the forensic examination of digital devices, I know that data in digital form can be stored on a variety of digital devices and that during the search of

the premises it is not always possible to search digital devices for digital data for a number of reasons, including the following:

a.   Searching digital devices can be a highly technical process that requires specific expertise and specialized equipment. There are so many types of digital devices and software in use today that it is impossible to bring to the search site all of the necessary technical manuals and specialized equipment necessary to conduct a thorough search. In addition, it may also be necessary to consult with specially trained personnel who have specific expertise in the type of digital device, software application or operating system that is being searched.

b.   Digital data is particularly vulnerable to inadvertent or intentional modification or destruction. Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted or password-protected data. As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is essential to conducting a complete and accurate analysis of data stored on digital devices.

c.   The volume of data stored on many digital devices will typically be so large that it will be highly impractical to search for data during the execution of the physical search of the premises. A single megabyte of storage space is the equivalent of 500 double-spaced pages of text. A single gigabyte of storage space, or 1,000 megabytes, is the equivalent of 500,000 double-spaced pages of text. Storage devices capable of storing 500 gigabytes (GB) of data are now commonplace in desktop computers. Consequently, each non-networked, desktop computer found during a search can easily contain the equivalent of 240 million pages of data, that, if printed out, would completely fill three 35' x 35' x 10' rooms to the ceiling. Further, a 500 GB drive could contain as many as approximately 450 full run movies or 450,000 songs.

d.   Electronic files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted or viewed via the Internet. Electronic files saved to a hard drive can be stored for years with little or no cost. Even when such files have been deleted,

they can be recovered months or years later using readily-available forensics tools.  Normally, when a person deletes a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the hard drive until it is overwritten by new data.  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space, i.e., space on the hard drive that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space for long periods of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a swap or recovery file.  Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or cache.  The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages.  Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer habits. Recovery of residue of electronic files from a hard drive requires specialized tools and a controlled laboratory environment.

          e.   Although some of the records called for by this warrant might be found in the form of user-generated documents (such as word processor, picture, and movie files), digital devices can contain other forms of electronic evidence as well. In particular, records of how a digital device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications and materials contained on the digital devices are, as described further in the attachments, called for by this warrant.  Those records will not always be found in digital data that is neatly segregable from the hard drive image as a whole.  Digital data on the hard drive not currently associated with any file can provide evidence of a file that was once on the hard drive but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave digital data on the hard drive that show what tasks and processes on the computer were recently used.  Web browsers, e-mail programs, and chat programs store configuration data on the hard drive that can reveal information such as online nicknames and passwords.  Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times the

computer was in use.  Computer file systems can record data about
the dates files were created and the sequence in which they were
created.  This data can be evidence of a crime, indicate the
identity of the user of the digital device, or point toward the
existence of evidence in other locations.  Recovery of this data
requires specialized tools and a controlled laboratory
environment.

     f.     Further, evidence of how a digital device has
been used, what it has been used for, and who has used it, may
be the absence of particular data on a digital device.  For
example, to rebut a claim that the owner of a digital device was
not responsible for a particular use because the device was
being controlled remotely by malicious software, it may be
necessary to show that malicious software that allows someone
else to control the digital device remotely is not present on
the digital device.  Evidence of the absence of particular data
on a digital device is not segregable from the digital device.
Analysis of the digital device as a whole to demonstrate the
absence of particular data requires specialized tools and a
controlled laboratory environment.

     g.     Given G. BENHAROSH's prior history, including,
that G. BENHAROSH sought to destroy evidence from a government
agency, I believe that failure to seize the digital devices
sought will result in evidence being destroyed, if left
unattended. Also, G. BENHAROSH, S. BENHAROSH and R. LEVI are
Hebrew speakers and the information on the digital devices may
not be readily apparent, given the language issue might
complicate the review.

     h.     In December 2010, the government requested
historical toll records from AT&T and Sprint/Nextel for the
phone numbers 818-770-5165, 818-506-0052, 818-633-3703, and 818-
232-2430, phones of the TARGET SUBJECTS.  On or about January 3,
2010, the DEA received toll records for phone number 818-770-
5165 (a phone associated with LEVI) and have not yet been
analyzed.  No other toll records for the above phones have been
received.

## NEED FOR PHONES AND CAMERAS OF G. BENHAROSH, S. BENHAROSH AND LEVI

     98.    Based on my experience, investigation of the TARGET

SUBJECTS and discussions with SA Booker, I am aware that

G. BENHAROSH, S. BENHAROSH and LEVI utilize cellular telephones for which there is probable cause to believe are and contain evidence of violations S. BENHAROSH's OFFENSES, LEVI's OFFENSES and G. BENHAROSH's OFFENSES.

99. During the November 22, 2010 interview with USCIS, S. BENHAROSH indicated, under oath, that the cellular phone number of herself was 818-633-3703, of LEVI was 818-770-5160 (subscriber David Cohen, 5247 Corteen Place, North Hollywood, CA), of G. BENHAROSH was 818-232-2430 and that her residential phone number was 818-506-0052. During the November 22, 2010 interview with USCIS, LEVI indicated, under oath, that his cell phone number was 818-770-5165.

100. On documents submitted to financial institutions and USCIS, G. BENHAROSH has indicated that his phone numbers are: 818-232-2430 and 818-762-4505. The seizure and search of these phones would aid in establishing G. BENHAROSH as the person who submitted the aforementioned financial documents that contained the social security number obtained under false pretenses.

101. Also, the numbers dialed and taken from the cell phones of G. BENHAROSH, S. BENHAROSH, and LEVI would demonstrate the frequency of contacts or lack thereof between S. BENHAROSH and LEVI and the frequency of contacts between S. BENHAROSH and G. BENHAROSH. This information is evidence as to whether S.

BENHAROSH and LEVI ever resided together and whether they are engaged in a sham marriage.

102. The digital photographs and videos taken from the cell phones and digital cameras of G. BENHAROSH, S. BENHAROSH, and LEVI would demonstrate whether G. BENHAROSH and S. BENHAROSH reside together (in contrast to S. BENHAROSH's statements to USCIS) and whether the marriage between S. BENHAROSH and LEVI is a sham and is for the sole purpose of changing S. BENHAROSH's immigration status.

NEED TO SEARCH SAFETY DEPOSIT BOX

103. According to AUSA J. Mark Childs, on January 3, 2011, AUSA Childs twice contacted "Angela" from the Bank of America ("BA"), Sherman Oaks Branch ("SOB"), located at 14701 Ventura Blvd, Sherman Oaks CA 91403 who indicated the following: that the annual fee at the BA SOB for a safety deposit box approximately, 3" in width, 2" in height and by 5" in length, is $61 a month (but if you pay in one installment there is a 15% discount for a total of $51.85) and that amount can be automatically deducted from the customer's BA checking account. "Angela" indicated that you could fit a passport into the safety deposit box.

104. According to BA checking account statement, for April 27, 2010 through May 24, 2010, "Simcha Ben-Harosh" and "Rafael Levi" have a BA checking account 04186-01453, located at the

Bank of America Sherman Oaks Branch. Per the statement, on May 17, 2010, $52.00 was debited from their account for "Safe Deposit Rental Fee 04186-01453." Based on the statements from "Angela" at BA SOI and my own experience with bank records, the BA statement indicates that S. BENHAROSH and LEVI paid $52.00 as an annual fee (in one installment) for a safety deposit box with BA, most likely at the BA SOI, for a term from May 17, 2010 to May 17, 2011.

105. Based on my investigation, experience and discussions with SA Booker, a safety deposit box is a place where persons place valuable documents, such as passports, identification cards, birth certificates, immigration papers and other valuable items in order to secure them. Thus, I believe that there is probable cause to believe that the safety deposit box at BA under the control of S. BENHAROSH and LEVI is likely to contain the items described in Attachment B.

BASIS FOR SEARCH OF SUBJECT PREMISES #1 and #3 and SUBJECT VEHICLE #1 AND SAFETY DEPOSIT BOX

106. Based upon the facts and circumstances set forth in the above paragraphs, I believe that probable cause exists for the issuance of a search warrant for the **SUBJECT PREMISES #1**, **SUBJECT PREMISES #3**, **SUBJECT VEHICLE #1**, and **SAFETY DEPOSIT BOX** for the following reasons, among others,:

i.   Individuals who have legally or illegally obtained a green card often store their green card, along with copies of other identification documents and their applications, in their primary residence, safety deposit box or vehicle because it is safe and reliable place to store such a valuable item. Currently, the primary residence of G. BENHAROSH and S. BENHAROSH is **SUBJECT PREMISES #1** and the primary vehicle of G. BENHAROSH is **SUBJECT VEHICLE #1.**

ii.   Also, if the individual with a green card is employed, the person could store the green card and other identification documents and their applications at his place of employment, if the location at the place of employment can be secured, such as in an office, locker, storage cabinet or desk.  Based on my investigation, G. BENHAROSH has been observed locking the front door to **SUBJECT PREMESIS #3** with keys which demonstrates he has control over the security of the **SUBJECT PREMISES #3**.  Also, per SA Reuter, as discussed herein, G. BENHAORSH has his own enclosed office within **SUBJECT PREMISES #3.**

iii.   During surveillance conducted in December 2009 and between March 2010 and January 2010, officers and agents observed G. BENHAROSH on dozens of occasions travel to or being present at **SUBJECT PREMISES #3**.  BENHAROSH, a leader at the synagogue, has been observed by surveillance members traveling to the synagogue several times daily, and opening and closing

68

the front entrance of **SUBJECT PREMISES #3** with a set of keys.
DMV records show that G. BENHAROSH's primary vehicle, **SUBJECT
VEHICLE #1**, S. BENHAROSH's vehicle, **SUBJECT VEHICLE #2** and E.
BENHAROSH's vehicle, **SUBJECT VEHICLE #3**, are registered to G.
BENHAROSH at the **SUBJECT PREMISES #3**.  **SUBJECT VEHICLE #2** and
**SUBJECT VEHICLE #3** have been observed at the former BENHAROSH
family residence at "6140 Rhodes Avenue".

ITEMS TO BE SEIZED FOR **SUBJECT PREMISES #1** (RESIDENCE OF
G. BENHAROSH AND S. BENHAROSH) **SUBJECT VEHICLES #1, #2 AND #3**
(VEHICLES OF G. BENHAROSH, S. BENHAROSH AND E. BENHAROSH,
RESPECTIVELY)

107.    Based on the foregoing, I respectfully submit that
there is probable cause to believe that the following items,
which constitute evidence, fruits, and instrumentalities of
violations of the G. BENHAROSH'S OFFENSES and S. BENHAROSH's
OFFENSES, will be found at the **SUBJECT PREMISES #1**, and **SUBJECT
VEHICLES #1, #2 and #3**.

a.    Permanent Resident Card (aka "green card") in the name
"Gavriel Ben Harosh" or "Gavriel Benharosh" and any document,
including green cards, immigration forms or petitions, bank
records and applications (such as applications for credit cards,
financial accounts or utility accounts) referencing the alien
registration number ending in "613."  The alien registration
number is a nine digit numbers (e.g., XXX-XXX-613) but the first
six numbers have been redacted herein for security purposes.

b.   Social Security Card with the last four digits of the
social security number ending in "5506" and any document,
including immigration forms or petitions, bank records, and
applications (such as applications for credit cards, financial
accounts or utility accounts) referencing the social security
number ending in "5506."  Social Security numbers are nine digit
numbers (e.g., XXX-XX-5506) but the first six numbers have been
redacted herein for security purposes.

c.   The California Driver's License ("CADL") in the name
"Gavriel Benharosh" or "Gavriel Ben Harosh" and any document,
including immigration forms or petitions, bank records, and
applications (such as applications for credit cards, financial
accounts or utility accounts) referencing a CADL number for
"Gavriel Benharosh" or "Gavriel Ben Harosh"  or a CADL number
whose first two digits are "E1" and the last two digits are
"28."  CADL Numbers are eight digits (e.g., E1XXXX28) but digits
have been redacted for security purposes.

d.   Documents, records, or materials reflecting the
existence or use of a green card or immigration document,
including any visa or immigration applications or border
crossing cards by Gavriel Benharosh aka Gavriel Ben Harosh aka
Gabriel Benharosh aka Gavriel Ben-Harosh  and Simcha Benharosh
aka Simcha Ben Harosh aka Simcha Ben-Harosh and Simcha B.
Harosh.

e.   Documents, records, or materials reflecting G. BENHAROSH or S. BENHAROSH application (1) for documents from a federal entity, (2) for documents from an entity from the state of California, and (3) to a financial institution (e.g., credit card or mortgage).

f.   Documents submitted by or received by G. BENHAROSH or S. BENHAROSH to or from INS, ICE, USCIS, DHS, DMV or SSA.

g.   Documents, records, or materials tending to show G. BENHAROSH's or S. BENHAROSH's identity, nationality and alienage, including, but not limited to, birth certificates, identification cards, voter registration cards, driver's licenses, military identity cards, national identity cards, and passports.

h.   Documents, records, or materials tending to show that G. BENHAROSH has a criminal history.  Such documents, include, but are not limited to, arrest reports, judgments of conviction, probation reports, hearing notices, and transcript records of the criminal proceedings.

i.   Keys, utility bills, leases, rental agreements, DMV registrations, and personal papers or possessions showing dominion and control over the **SUBJECT PREMISES #1, SUBJECT PREMISES #3, SUBJECT PREMISES #4, the SAFETY DEPOSIT BOX,** and **SUBJECT VEHICLES #1, #2** and **#3.**

71

j. Safe deposit box keys and rental records, storage facility keys, and all records pertaining to the location, rental, access, and entry of any storage facility.

k.  All photographs or videos of LEVI.

l.  All notes, cards, or letters from LEVI to S. BENHAROSH.

m.  All notes, cards, or letters from S. BENHAROSH to LEVI.

n.  All photographs or videos of S. BENHAROSH and G. BENHAROSH together.

o. All documents referencing that either G. BENHAROSH, S. BENHAROSH or LEVI resided at 12613 Emelita Street, North Hollywood; 12618 Califa Street, Valley Village (North Hollywood), CA 91607; 6140 Rhodes Avenue, North Hollywood, California 91606; 12160 Burbank Blvd., #1, North Hollywood, CA 91607; and 5521 Vantage Avenue, North Hollywood, California; including lease or rental agreements, utility bills and rental payments.

p.  Cell phones and smart phones, including those for phone numbers: 818-762-4505, 818-232-2430, 818-506-0052 and 818-633-3703.

q.  DIGITAL DEVICES

(1) With respect to any digital devices containing evidence falling within the scope of the foregoing search categories, records, documents, materials, photographs, videos, or evidence of the absence of same, sufficient to show the actual user(s) of the digital device during the time period between July 2006 and the present.

72

(2)   As used above in paragraphs above, the terms records, documents, materials, photographs, and videos, include records, documents, materials, photographs, videos, created, modified or stored in any form, including in digital form on any digital device and any forensic copies thereof.  As used both above and below, the term "digital device" includes any electronic system or device capable of storing and/or processing data in digital form, including: digital cameras, memory chips, central processing units; laptop or notebook computers; personal digital assistants; wireless communication devices such as telephone paging devices, beepers, and mobile telephones; peripheral input/output devices such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices such as modems, cables, and connections; storage media such as hard disk drives, floppy disks, CD-roms, CD-Rs, DVD-R, compact disks, magnetic tapes used to store digital data (excluding analog tapes such as VHS), and memory chips; and security devices.

(3)   In searching digital data stored on digital devices, law enforcement personnel executing this search warrant will employ the following procedure:

a.    Law enforcement personnel or other individuals assisting law enforcement personnel will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) to an appropriate law enforcement laboratory or similar facility to be searched at that location. The team of law enforcement personnel, which may include the investigating agent(s), and/or individuals assisting law enforcement personnel searching the digital device(s) shall complete the search as soon as is practicable but not to exceed 60 days from the date of the execution of the warrant.  If additional time is needed, the government may seek an extension of this time period from the Court within the original 60 day period from the date of execution of the warrant.

b.    The team searching the digital devices will do so only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.
i.    The team may subject all of the data contained in the digital device capable of containing items to be seized as specified in this warrant to the protocols to determine whether the digital device and any data falls within the items to be seized as set forth herein.  The team searching the digital device may also search for and attempt to recover "deleted," "hidden" or encrypted data to determine, pursuant to

the protocols, whether the data falls within the list of items to be seized as set forth herein.

           ii.  The team searching the digital device also may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

          c.  When searching a digital device pursuant to the specific protocols selected, the team searching the digital device shall make and retain notes regarding how the search was conducted pursuant to the selected protocols.

          d.  If the team searching a digital device pursuant to the selected protocols encounters immediately apparent contraband or other evidence of a crime outside the scope of the items to be seized, the team shall immediately discontinue its search of that digital device pending further order of Court and shall make and retain notes detailing how the contraband or other evidence of a crime was encountered, including how it was immediately apparent contraband or evidence of a crime.

          e.  If the search determines that a digital device does not contain any data falling within the list of items to be seized pursuant to this warrant, the government will as soon as practicable return the device and delete or destroy all the forensic copies thereof.

          f.  If the search determines that the digital device or the forensic copy does contain data falling within the list of the items to be seized pursuant to this warrant, the government may retain the digital device and the forensic copy without further order of the court.

   (4)  In order to search for data that is capable of being read or interpreted by a digital device, law enforcement personnel are authorized to seize the following items, subject to the procedures set forth above:

          a.  Any digital device capable of being used to commit, further or store evidence of the offense listed above;

          b.  Any equipment used to facilitate the transmission, creation, display, encoding or storage of digital data, including word processing equipment, modems, docking stations, monitors, printers, plotters, encryption devices and optical scanners;

          c.  Any magnetic, electronic or optical storage device capable of storing data, such as floppy disks, hard disks, tapes, CD-ROMs, CD-R, CD-RWs, DVDs, optical disks,

printer or memory buffers, smart cards, PC cards, memory
calculators, electronic dialers, electronic notebooks, cellular
telephones and personal digital assistants;

    d. Any documentation, operating logs and reference
manuals regarding the operation of the digital device or
software used in the digital device;

    e. Any applications, utility programs, compilers,
interpreters and other software used to facilitate direct or
indirect communication with the digital device;

    f. Any physical keys, encryption devices, dongles
and similar physical items that are necessary to gain access to
the digital device or data stored on the digital device; and

    g. Any passwords, password files, test keys,
encryption codes or other information necessary to access the
digital device or data stored on the digital device.

ITEMS TO BE SEIZED FOR **SUBJECT PREMISES #3** (Synagogue)

  108. Based on the foregoing, I submit that there is
probable cause to believe that the following items, which
constitute evidence, fruits, and instrumentalities of violations
of the G. BENHAROSH'S OFFENSES and S. BENHAROSH's OFFENSES, will
be found at the **SUBJECT PREMISES #3**: Items "a" through "g," "i,"
"n" and "o," listed in paragraph 107 above.

  Excluded from the search of **SUBJECT PREMISES #3** will be,
(1) the main ceremonial area, that is described in Attachment C
hereto as "Main Area"; (2) the kitchen area, that is described
in Attachment C hereto as "Kitchen"; and (3) any restrooms.

ITEMS TO BE SEIZED FOR **SUBJECT PREMISES #4** (Container)

  109. Based on the foregoing, I submit that there is
probable cause to believe that the following items, which
constitute evidence, fruits, and instrumentalities of violations
of the G. BENHAROSH'S OFFENSES and S. BENHAROSH's OFFENSES, will

be found at the **SUBJECT PREMISES #4:** Items "a" through "g," "i," "n" and "o," listed in paragraph 107 above.

ITEMS TO BE SEIZED FROM SAFETY DEPOSIT BOX

110. Based on the foregoing, I submit that there is probable cause to believe that the following items, which constitute evidence, fruits, and instrumentalities of violations of the G. BENHAROSH'S OFFENSES and S. BENHAROSH's OFFENSES, will be found at the SAFETY DEPOSIT BOX: Items "a" through "g" and "k," listed in paragraph 107 above.

ITEMS TO BE SEIZED FROM **SUBJECT PREMISES #2 (LEVI's RESIDENCE) & SUBJECT VEHICLE #4** (LEVI's VEHICLE)

111. Based on the foregoing, I submit that there is probable cause to believe that the following items, which constitute evidence, fruits, and instrumentalities of violations of LEVI's TARGET OFFENSES, will be found at the **SUBJECT PREMISES #2** and **SUBJECT VEHICLE #4:**

a.   All photos of S. BENHAROSH.

b.   All notes, cards, or letters from LEVI to S.BENHAROSH.

c.   All notes, cards, or letters from S. BENHAROSH to LEVI.

d.   All documents that reference the name S. BENHAROSH.

e.   Photographs of LEVI and Lilia Lutotski.

f.   All documents referencing that either LEVI or S. BENHAROSH resided or received mail at 6140 Rhodes Avenue, North

76

Hollywood, California, 91606; 5914 Wilkinson Avenue, North Hollywood, CA; 12160 Burbank Blvd., #1, North Hollywood, CA 91607; 5252 Corteen Place, #37, Valley Village, CA or any other apartment at 5252 Corteen Place, Valley Village, CA; including lease or rental agreements, utility bills and rental payments.

g.   All cell phones and smart phones of LEVI, including, but not limited to phone numbers 818-770-5165 and 818-770-5160. The protocols for searching, seizing and reviewing these phones will be followed as described above in paragraph 107 and as described attachment B.  These phones will have evidence of the contacts or lack of contacts between and photographs of S. BENHAROSH and LEVI that are evidence that S. BENHAROSH and LEVI do not reside together and the marriage between S. BENHAROSH and LEVI is a sham.

CONCLUSION

112.   Based upon the totality of the facts set forth in this Affidavit, there is probable cause to believe that G. BENHAROSH has committed violations of 18 U.S.C. § 1001 [False or Fraudulent Statements]; 18 U.S.C. § 1028A [Predicates for this offense are mail fraud (18 U.S.C. § 1341) and misuse of evidence of naturalization (18 U.S.C. § 1423)]; 18 U.S.C. § 1341 [Mail Fraud]; 18 U.S.C. § 1423 [Misuse of Evidence of Naturalization]; 18 U.S.C. § 1425 [Attempted Procurement of Naturalization of Another Unlawfully]; § 1546 [False Statement on Immigration

Document]; 18 U.S.C. § 1621 (Perjury); 42 U.S.C. § 408(a)(6)

[Furnishing False Information to the Social Security

Administration]; 42 U.S.C. § 408(a)(7)(A) [Fraudulent Use of a

Social Security Number Produced by False Information] and 42

U.S.C. § 408(a)(7)(B) [Fraudulent Use of a Social Security

Number on Non-Federal Documents] (collectively, "G. BENHAROSH's

OFFENSES").

113. Based upon the totality of the facts set forth in this

Affidavit, there is probable cause to believe that the S.

BENHAROSH and LEVI have committed violations of 18 U.S.C. § 371

[Conspiracy to commit a federal offense, namely the offenses

listed hereinafter]; 18 U.S.C. § 1001 [False or Fraudulent

Statements]; 18 U.S.C. § 1546 [False Statement on Immigration

Document]; 18 U.S.C. § 1621 (Perjury); 8 U.S.C. §§

1324(a)(1)(A)(iv), (B)(I) [Encouraging or Inducing Aliens to

Reside in the U.S. Illegally]; and 8 U.S.C. § 1325(c) [Marriage

Fraud] ("S. BENHAROSH's OFFENSES" or "LEVI's OFFENSES").

114. Based upon the totality of the facts set forth in

this Affidavit, there is probable cause to believe that evidence

of G. BENHAROSH's OFFENSES, S. BENHAROSH's OFFENSES or LEVI's

OFFENSES, as described in Attachment B, will be found at the

locations for which search warrants are being sought.  Thus, I

respectfully request that search warrants be issued for each of

these locations, as described in Attachment A, authorizing any

DHS agent or HSI agent, with assistance of other law enforcement officers and agents, to enter and search the premises for items more particularly described in Attachment B, all of which are evidence of and fruits and instrumentalities of violations of G. BENHAROSH's OFFENSES and S. BENHAROSH's and LEVI's OFFENSES.

115.  Based upon the totality of the facts set forth in this Affidavit, there is probable cause to believe that evidence, as described in Attachment B, of S. BENHAROSH's and LEVI's OFFENSES will be found at the **SUBJECT PREMISES #2** and **SUBJECT VEHICLE # 4**, locations for which search warrants are being sought.  Thus, I respectfully request that search warrants be issued for each of these locations, as described in Attachment A, authorizing any DHS agent or HSI agent, with

///

assistance of other law enforcement officers and agents, to

enter and search the premises for items more particularly

described in Attachment B, all of which are evidence of and

fruits and instrumentalities of violations of S. BENHAROSH's and

LEVI's OFFENSES.


/s/
_____
Ryan R. Wilson
Special Agent
Homeland Security Investigations



Subscribed and sworn to before me
This day of January 5, 2011.


PATRICK J. WALSH
_____
THE HONORABLE PATRICK J. WALSH
UNITED STATES MAGISTRATE JUDGE